PIGGLY WIGGLY SOUTHERN, INC., SOUTHERN GRAPHIC ART, AND GEORGIA SALES COMPANY, PETITIONERS V. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 18886–82.     Filed April 18, 1985.

*Charles T. Zink*, for the petitioners.
*J. Steven Erie*, for the respondent.

HAMBLEN, *Judge*: Respondent determined the following deficiencies in petitioners' Federal corporate income taxes:

| Fiscal year | Deficiency |
| --- | --- |
| June 25, 1977 | $82,057.00 |
| June 24, 1979 | 1,271.56 |

After concessions, the issues for decision are: (1) Whether new equipment purchased by petitioner Piggly Wiggly Southern, Inc. (Piggly Wiggly),[1] during the fiscal years 1977 and 1979 for use in its new, relocated, or remodeled stores was "placed in service" during those fiscal years and therefore qualified for depreciation and investment tax credits under sections 167[2] and 38 during the years at issue; and, (2) whether central heating and air-conditioning units installed by petitioner in its stores qualified as section 38 property for investment tax credit purposes.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Piggly Wiggly, a Georgia corporation, filed timely corporate returns on the accrual basis for the fiscal years 1977 and 1979. During these years, petitioner was engaged in the retail

---

[1] Southern Graphic Art and Georgia Sales Co. are wholly owned subsidiaries of Piggly Wiggly. They are parties to this action only by virtue of having filed consolidated corporate returns with Piggly Wiggly. Therefore, "petitioner" in the singular form hereinafter refers to petitioner Piggly Wiggly.

[2] All section references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

marketing of food products and operated a chain of supermarket stores throughout Georgia.

During its fiscal years ending June 25, 1977, June 24, 1978, and June 24, 1979, petitioner purchased new equipment for use in the operation of new, relocated, and remodeled stores. It deducted depreciation allowances and claimed investment tax credits for the fiscal years in which the equipment was purchased. The new equipment consisted of items such as refrigerated display cases, shopping carts, mixers, saws, and scales.

Alton Holloway (Holloway) was petitioner's vice president in charge of research and store development during the years in issue. His duties included determining when a new store was needed, monitoring the installation of equipment, and approving payment invoices for newly purchased machinery and equipment. Holloway did not approve payment invoices until the machinery and new equipment were received and installed.

During 1977 and 1978, petitioner remodeled four stores. The stores were not closed during the remodeling period. When remodeling was completed, the stores closed for 1 day to clean up, replace signs, and change prices for promotional activity. Some of the new equipment purchased during the fiscal years 1977 and 1978 was installed in these stores. New equipment was operational and in use at the remodeled stores on the day of installation. Petitioner claimed depreciation deductions and investment tax credits for the fiscal years in which the equipment was installed.

In 1977, 1978, and 1979, petitioner opened five new and one relocated stores.[3] Petitioner's new and relocated stores required the construction of new store buildings. Some of the new equipment purchased during the fiscal years 1977, 1978, and 1979, was placed in these stores. These six stores did not open for business until after the close of the fiscal years in which depreciation deductions and investment tax credits were claimed on the new equipment.

Set forth below is a summary outlining (1) the date petitioner opened the new, relocated, and remodeled stores; (2) the fiscal year in which petitioner claimed deductions and credits

---

[3]The stipulation of facts includes a sixth new store, Warner Robins 35. However, this store is not listed in the statutory notice as one for which the deductions are in issue.

on equipment; and, (3) the fiscal year in which respondent determined the deductions were proper:

| Store | Date opened | Fiscal year claimed | Fiscal year statutory notice |
|---|---|---|---|
| New Macon 81 | July 20, 1977 | 1977 | 1978 |
| Remodeled Statesboro 28 | Sept. 20, 1977 | 1977 | 1978 |
| Relocated Wrightsville 52 | Feb. 8, 1978 | 1977 | 1978 |
| New Augusta 77 | Oct. 26, 1977 | 1977 | 1978 |
| New Cordele 38 | Feb. 8, 1977 | 1978 | 1979 |
| New Sylvester 70 | Nov. 17, 1979 | 1978 | 1980 |
| Remodeled Moultrie 66 | Oct. 1, 1978 | 1978 | 1979 |
| Remodeled Dublin 43 | Nov. 8, 1978 | 1978 | 1979 |
| Remodeled Sandersville | Oct. 1, 1978 | 1978 | 1979 |
| New Sylvester 70 | Nov. 17, 1979 | 1979 | 1980 |
| New Millen 33 | May 1, 1980 | 1979 | 1980 |

During 1977 and 1979, petitioner purchased and installed heating, ventilating, and air-conditioning (HVAC) units in several of its retail stores. The HVAC units were depreciable property with useful lives of 7 or more years. Petitioner claimed investment tax credits on the HVAC units.

Piggly Wiggly's stores used a variety of open-front refrigerated display cases purchased from several different manufacturers. Because the stores depended on high volume sales to stay in business, open-front cases were a necessity. The cases are designed for use in stores where temperature and humidity were controlled. The specifications on these cases stated the following: "Important: Operating ambient limits for this case of 75 [degrees] Fahrenheit, 55% relative humidity." No open-front cases were available without these environmental requirements. In previous years, before the advent of open-front cases, petitioner had operated stores without air-conditioning.

If the cases are operated at higher temperature and humidity levels, their coils ice over, the cases malfunction, and the food displayed, spoils. Without air-conditioning, the cases can only operate for a short period of time. In 1979, petitioner was required by Federal energy conservation measures to raise the temperature in its stores. Petitioner issued a memorandum outlining the following problems resulting from raising the thermostat settings:

1. Our fresh meat cases are not keeping the product cold enough on the surface of our display cases. As a result, at #151 our pullbacks have

increased by 50% more than normal. Other markets are experiencing similar increases in product that is losing its bloom inmaterially.

2. Our fresh produce department cases are not operating properly. The product is not holding up to the normal shelf life.

3. Our upright freezers are icing up more. The cold air is falling away from the cases more than normal.

4. Our chest type freezer cases are not holding product frozen on the top layers, especially ice cream and juices.

We have put a thermometer in the center of our store and found it to be as warm as 85 [degrees] in some stores.

We have talked to Mr. Joe Justice, our refrigeration man here, and he has told us that these cases are designed to function under certain limited conditions in air conditioned buildings, and by [sic] setting the adjustments lower on our motors is not the answer to keeping our product in our cases. We tried to lower our case temperature at #175 meat case and discovered the product frozen on the bottom and loss of bloom (turned dark) on top.

We realize it's early to measure the loss it's costing us in product, but it is and can be substantial if we have to keep our thermostats set on 75 [degrees].

The Department of Energy (DOE) created exemptions to the conservation measures. The explanation accompanying the proposed DOE regulations, 44 Fed. Reg. 31928 (1979), states:

Proposed section 490.31(a)(3) is intended to avoid health hazards where certain temperature and humidity levels are required for the proper storage and handling of food and other agricultural commodities. By way of illustration, this section would exempt supermarkets and grocery stores where temperature and humidity levels other than those mandated in the regulations are required to preserve produce or for the proper refrigeration of perishable items on open shelf units.

Because of its problems with its refrigerator cases, Piggly Wiggly swiftly obtained an exemption to the DOE conservation requirements.

A pamphlet published by the Food Marketing Institute (FMI), entitled, "Why Is It So Cold In Here?" addressed the use of air-conditioning in supermarkets. It stated, in pertinent part:

Q. Why don't supermarkets cut their air conditioning in the summer, to save energy and to make it less cold?

A. Unlike other commercial buildings, supermarkets do not base air conditioning on comfort considerations. Rather, air conditioning works together with the refrigerators in keeping perishable foods at proper temperature.

Petitioner's manager of refrigeration and energy systems during the years in issue was Benny Smith (Smith). We found Smith to be a forthright, knowledgeable, and credible witness. The air-conditioning systems placed in petitioner's stores were designed by Smith. Smith's choice of systems and designs was based upon the needs of the refrigeration equipment in the stores, and not upon considerations of customer comfort. One reason the HVAC units were selected was because they are designed to meet, automatically, the 55-percent relative humidity requirements of the refrigerator cases.

The HVAC units operated 24 hours a day, and were not hooked up to a duty cycling system. The units operated while the stores were closed to remove moisture from the air, and enabled the cases to continue functioning. The units were required to cool and heat entire stores because the refrigerated cases were placed throughout the stores. Several diffusers were placed over the cash register areas because the customers standing in line and the registers generated heat. The HVAC units weighed 800 to 1000 pounds and could be removed. Petitioner occasionally removed and replaced the units. The units were attached to the ceilings of the stores with simple braces and bolts.

Respondent submitted a brief expert witness report prepared by Denis Nonaka (Nonaka) a "valuation engineer." A valuation engineer renders technical advice on depreciation, investment credit, and allocation of purchase price issues. Nonaka did not have a degree in engineering and had no experience in refrigeration or the food store industry. Nonaka's report relies heavily upon the text of a speech given by an official of the Warren-Sherer refrigeration company. The speech deals generally with the entire food store industry. The report quotes only the first sentence of the following paragraph found on page eight of the speech:

The Environmental System for a supermarket must not be designed only to heat or cool the market for customer comfort, but provide precise control of the temperature and humidity with minimum drafts or stagnation of air around the refrigerated fixtures. You might compare the need of precise control of the supermarket environment to that of a computer room in that the environment is maintained for maximum operating performance of the equipment within the space. It is the heart of energy management in the supermarket and properly sizing the air conditioning unit is the first step to precise environmental control.

OPINION

## *Machinery and Equipment*

In the notice of deficiency issued to petitioner, respondent determined that Piggly Wiggly was not entitled to depreciation deductions and investment tax credits on new equipment used in its new, relocated, and remodeled stores because the equipment was not placed in service during the fiscal years in which the deductions and credits were claimed.

Section 167(a) provides in part:

There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

 (1) of property used in the trade or business, or
 (2) of property held for the production of income.

Section 1.167(a)–10(b), Income Tax Regs., provides that the "period for depreciation of an asset shall begin when the asset is placed in service." Section 1.167(a)–11(e)(1)(i), Income Tax Regs., provides:

Property is first placed in service when first placed in a condition or state of readiness and availability for a specifically assigned function * * *. In general the provisions of paragraph (d)(1)(ii) and (d)(2) of section 1.46–3 shall apply for the purpose of determining the date on which property is placed in service * * *

Section 1.46–3(d) provides in pertinent part:

(1) For purposes of the credit allowed by section 38, property shall be considered placed in service in the earlier of the following taxable years:

 (i) The taxable year in which, under the taxpayer's depreciation practice, the period for depreciation with respect to such property begins; or

 (ii) The taxable year in which the property is placed in a condition or state of readiness and availability for a specifically assigned function * * *

(2) In the case of property acquired by a taxpayer for use in his trade or business (or in the production of income), the following are examples of cases where property shall be considered in a condition or state of readiness and availability for a specifically assigned function: * * *

 (ii) Operational farm equipment is acquired during the taxable year and it is not practicable to use such equipment for its specifically assigned function in the taxpayer's business of farming until the following year.

Depreciation and investment tax credits are not allowed on assets acquired for a business that has not begun operations.

*Richmond Television Corp. v. United States,* 354 F.2d 410 (4th Cir. 1965). See also *Simonson v. United States,* 752 F.2d 341 (8th Cir. 1985); *Petrich v. Commissioner,* 676 F.2d 712 (9th Cir. 1982), affg. without published opinion a Memorandum Opinion of this Court.

As a general rule, an asset subject to depreciation and the investment tax credit is clearly considered as placed in service when it is acquired and put into use in a trade or business. See *Cooper v. Commissioner,* 542 F.2d 599 (2d Cir. 1976), affg. a Memorandum Opinion of this Court; *Madison Newspapers, Inc. v. Commissioner,* 47 T.C. 630, 633 (1967).

As indicated by the regulation, the "placed in service" requirement is met when an asset is in a state of readiness and available for a specifically assigned function in an operating trade or business. In *Schrader v. Commissioner,* 582 F.2d 1374 (6th Cir. 1978), affg. a Memorandum Opinion of this Court, depreciation was allowable with respect to an air-conditioner even though, because of weather conditions, the taxpayer did not actually use the air-conditioner until the following year.

*Sears Oil Co. v. Commissioner,* 359 F.2d 191 (2d Cir. 1966), revg. on this issue a Memorandum Opinion of this Court, and *SMC Corp. v. United States,* an unreported case (E.D. Tenn. 1980, 46 AFTR 2d 80–5827, 80–2 USTC par. 9642), affd. per curiam 675 F.2d 113 (6th Cir. 1982), represent the only other instances where depreciation and investment tax credits were allowed on property not yet in use.

In *Sears Oil* the taxpayer purchased a canal barge, which it was unable to use until the following year because the canal was frozen. The Second Circuit (359 F.2d at 198), found that the taxpayer was entitled to depreciation in the year of purchase because the barge was gradually deteriorating since it was "subject to the weather elements," because the freezing of the canal was "not a condition which the taxpayer desired to bring about," and because "depreciation may be taken when depreciable property is available for use 'should the occasion arise,' even if the property is not in fact in use." In arriving at this finding the Second Circuit noted that the taxpayer was already in the business for which the depreciable asset had been purchased.

In *SMC Corp.* the taxpayer purchased a scrap shredder and a crane which it was unable to use until the following fiscal

year because the power company had failed to connect the electrical lines needed to run the equipment. The Tennessee District Court relied on the decision in *Sears Oil*:

In *Sears Oil* every prerequisite to the use of the barge had been completed prior to the end of the fiscal year. Similarly, SMC Corporation's equipment had been completely constructed or assembled * * *. The only impediment to the operation of the equipment was the lack of a permanent supply of electric power * * * which was outside the control of the taxpayer. In *Sears Oil* the only impediment to the operation of the barge was a frozen canal.

Finding that the taxpayer should not be "penalized" for the failure of the electric company, the District Court allowed the taxpayer's claims for depreciation deductions and investment tax credits.

In the instant case, the determinations of respondent are presumptively correct and the burden is on petitioner to prove entitlement to the claimed depreciation and credits. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a). Respondent determined that the equipment in petitioner's new, relocated, and remodeled stores was not placed in service during the fiscal years claimed by petitioner.

We disagree with respondent's determination with regard to the four remodeled stores. Respondent placed great weight on the "opening" of these stores in the fiscal years subsequent to the purchase of the equipment. However, it is clear from the evidence that these "openings" served primarily promotional purposes and did not relate to the installation and use of the new equipment. We find that the equipment in these four stores, which was installed, operating, and in use, in the years purchased, was placed in service during the fiscal years in which the equipment was purchased. Therefore, we hold for petitioner with regard to the depreciation deductions and investment tax credits claimed for the equipment in the four remodeled stores.

Petitioner asserts that it is also entitled to the depreciation and credits claimed with regard to the equipment installed in the new and relocated stores. Citing *Sears Oil Co. v. Commissioner, supra*, and *SMC Corp. v. Commissioner, supra*, petitioner argues that the equipment need not actually be used to be placed in service, but need only be available for use "should the occasion arise." Petitioner contends that since the equipment was operational, aging, and available for use in the new

stores, it was placed in service during the fiscal years in which the equipment was purchased rather than the later fiscal years in which the stores opened for business.

We do not agree with petitioner's analysis. The equipment was placed in stores that were not yet open for business. The common thread found in *Schrader, Sears Oil, SMC Corp.*, and the regulation examples is that the taxpayers already were engaged in the business for which the equipment was purchased.

Furthermore, the taxpayers in those instances had done all that was in their power to place the equipment into service. Weather conditions prevented the taxpayer in *Schrader* from using the air-conditioner, and prevented the taxpayer in *Sears Oil* from using the barge in the years the equipment was purchased. In *SMC Corp.*, the power company's actions stopped the taxpayer from using its crane and shredder.

In the instant case, the opening of the new and relocated stores was wholly within the control of Piggly Wiggly. The cost of the equipment did not contribute to, and therefore should not be charged against, income for an accounting period prior to the years in which the stores opened for business. See *Massey Motors, Inc. v. United States*, 364 U.S. 92, 104 (1960).

Equipment located in retail stores, which is to be used in connection with the trade or business conducted in those stores, is placed in service upon the opening of the stores. We find that petitioner failed to satisfy the placed in service requirements of sections 1.167(a)–10(b), 1.167(a)–11(e)(1), and 1.46–3(d), Income Tax Regs., and, therefore, uphold the determination of respondent disallowing the claimed depreciation deductions and investment tax credits for the equipment in the new and relocated stores. We have considered petitioner's other arguments and find them unpersuasive.

## HVAC Units

The second issue for consideration is whether the HVAC units installed by petitioner in its supermarkets qualify as section 38 property for investment tax credit purposes.

Section 38 allows a credit against tax for investments in certain types of property, described as "section 38 property." In relevant part, section 48(a) states:

(1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—
    (A) tangible personal property (other than an air conditioning or heating unit),[4] or
    (B) other tangible property (not including a building and its structural components) but only if such property—
        (i) is used as an integral part of manufacturing, production, or extraction * * *

Petitioner initially argues that its preparation of meat for retail sale places it in the business of manufacturing or producing for purposes of section 48(a)(1)(B)(i). Petitioner's stores, however, were retail supermarkets, and were held out as such to the public. Activities involving the sale of merchandise and food to the general public for personal or household consumption and the rendering of services incidental to the sale of such goods are considered retail activities rather than manufacturing or producing activities. See Rev. Rul. 81–66, 1981–1 C.B. 19, 20. The meat prepared in petitioner's stores was for direct sale to and consumption by the general public. Thus, the preparation of meat was incidental to petitioner's retailing activities, and was not among the activities encompassed by section 48(a)(1)(B)(i).

In order to qualify as section 38 property, the HVAC units must be tangible personal property under section 48(a)(1)(A). Section 1.48–1(c), Income Tax Regs., provides in pertinent part:

For purposes of this section, the term "tangible personal property" means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are stuctural components of such buildings or structures). Thus, buildings, swimming pools, paved parking areas, wharves and docks, bridges, and fences are not tangible personal property. Tangible personal property includes all property (other than structural components) which is contained in or attached to a building.

Pursuant to section 38(b), respondent, in section 1.48–1(e)(2),[5] Income Tax Regs., defined the term "structural components" as follows:

---

[4]The parenthetical language was added to sec. 48(a)(1)(A) by sec. 301(d)(1) of the Energy Tax Act of 1978, Pub. L. 95–618, 92 Stat. 3174, 3199 (1978), for equipment placed in service after September 1978.

[5]This regulation does not reflect the amendments made by the Energy Tax Act of 1978. See note 4.

The term "structural components" includes such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefor such as panelling or tiling; windows and doors; all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts; * * * and other components relating to the operation or maintenance of a building. *However, the term "structural components" does not include machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs. Machinery may meet the "sole justification" test provided by the preceding sentence even though it incidentally provides for the comfort of employees, or serves, to an insubstantial degree, areas where such temperature or humidity requirements are not essential.* For example, an air conditioning and humidification system installed in a textile plant in order to maintain the temperature or humidity within a narrow optimum range which is critical in processing particular types of yarn or cloth is not included within the term "structural components." * * * [Emphasis added]

This Court has held that section 1.48–1(e)(2), Income Tax Regs., represents an accurate interpretation of congressional intent with respect to the treatment of heating and air-conditioning equipment and has determined that the regulation has the full force and effect of law. *Fort Walton Square, Inc. v. Commissioner,* 54 T.C. 653, 661 (1970). See *Samis v. Commissioner,* 76 T.C. 609, 619 (1981).

In *Fort Walton Square, Inc. v. Commissioner, supra,* we found that a shopping center's rooftop air-conditioning and heating systems constituted "structural components" of the building. See also *Dixie Manor, Inc. v. United States,* an unreported case (W.D. Ky. 1979, 47 AFTR 2d 81–1298, 79–2 USTC par. 9469), affd. without published opinion 652 F.2d 57 (6th Cir. 1981). In *Kramertown Co. v. Commissioner,* 488 F.2d 728 (5th Cir. 1974), affg. a Memorandum Opinion of this Court, the rooftop air conditioners of a shopping center were held to be components of a central air-conditioning system and, thus, constituted "structural components." The Fifth Circuit in *Kramertown Co.* stated at page 731, that:

The motors and compressors of most central air conditioning units are capable of being removed and replaced by relatively simple mechanical methods. Thus, the quality of removability is not the sole determinant of whether a piece of machinery is a structural component. The weight, location and capacity of these storewide rooftop units are all indications of the reasonableness of classifying these machines of [sic] structural components of the buildings they serve under * * * a permanency test.

This Court held in *Circle K Corp. v. Commissioner*, T.C. Memo. 1982–298, that air-conditioning units installed in convenience stores were structural components and were not section 38 property. We rejected the taxpayer's argument that the units were "individual units" and found that they were part of a central air-conditioning system. The fact that the units might be removed did not affect their status as "structural components." We also rejected the taxpayer's contention that under section 1.48–1(e)(2), Income Tax Regs., the air-conditioning units were not structural components because they were installed to meet temperature or humidity requirements. The units were not essential to the taxpayer's operation of any machinery or processing of materials or foodstuffs. Since the failure to have air-conditioning would have placed the taxpayer at a competitive disadvantage, we found that "a substantial reason for the installation of the air conditioning units was to provide for the comfort of petitioner's customers, a purpose that is outside the scope of the regulatory exception."

In the instant case, the HVAC units installed by petitioner are, without consideration of the sole justification test, "structural components" as defined by section 1.48–1(e)(2), Income Tax Regs.[6] However, the evidence presented by petitioner clearly establishes that the sole justification for the installation of the HVAC units was the necessity to meet the temperature and humidity requirements of the refrigeration equipment in petitioner's stores.

The equipment specification sheets, the FMI pamphlet, and the testimony of Smith all showed that petitioner's equipment required environmental limits of 75 degrees Fahrenheit and 55 percent humidity. The HVAC units were designed specifically to meet these environmental limits. In 1979, the DOE recognized petitioner's need to operate its equipment within these environmental limits and granted petitioner an exemption to the regulations requiring higher thermostat settings. At higher temperatures, petitioner's equipment would ice up and then cease to function, spoiling the food contained in the cases.

---

[6]There is no dispute that the HVAC units constructed a central air-conditioning system.

In *Fort Walton Square, Inc. v. Commissioner, supra,* the issue was whether air-conditioning and heating units were part of a central system and thus constituted structural components. In *Fort Walton Square,* as in *Kramertown Co.,* the purpose of the systems in the shopping centers was clearly customer convenience, and there was no argument that the systems were essential to the operation of machinery. Here, petitioner does not contest the fact that the HVAC units are a central system, but instead argues that the HVAC units are not structural components because they are essential to the operation of the refrigerator cases. Thus, the instant case is distinguishable from the prior cases, which do not reach this further issue.

This Court considered whether an air-conditioning system in a convenience food store qualified as section 38 property in *Circle K Corp. v. Commissioner, supra.* We found that the system was not essential to the operation of any machinery. Petitioner has distinguished his case from *Circle K Corp.,* pointing to the differences in operation of a convenience store and a supermarket. Convenience stores use closed-door refrigerator cases, while high-volume-dependent supermarkets must use open-front cases, which require environmental conditions unnecessary for the operation of closed-door cases.

Respondent asserts that the HVAC units were installed to allow petitioner to compete with other air-conditioned supermarkets in attracting customers. The evidence submitted by respondent to support this argument and to rebut petitioner's evidence consists of the brief expert witness report prepared by Nonaka. Nonaka had no experience in refrigeration or the food store industry. His report relies heavily on a speech given by a refrigeration company official dealing in general terms with the entire retail supermarket industry. From these generalities, Nonaka concludes that petitioner's HVAC units were installed for worker and customer comfort, and not to meet the needs of the equipment. Nonaka's report errs in its failure to look at facts relating to petitioner's specific situation. For example, petitioner does not employ duty cycling and never operated an un-air-conditioned supermarket with open-front cases. Further, by picking and choosing, Nonaka's report only quoted and relied on the language in the speech that supported his position. Because Nonaka had no experience with the food store industry and because his short report

contains errors and generalizations, we afford it little evidentiary weight.

Respondent's arguments in support of his position are similarly flawed. Attacking petitioner's assertion that the HVAC units are essential to the operation of the equipment, respondent points to the absence of humidity registers in the stores, despite the fact that the HVAC units are designed to meet the humidity requirements without such registers. Further, respondent alleges that the impaired functioning of the refrigerator cases prior to petitioner's obtaining an exemption constitutes proof that the equipment can work without environmental controls.

Respondent argues that the environmental control provided by the HVAC units was primarily for petitioner's workers and customers. The operation of the HVAC units indubitably benefited petitioner's workers and customers. However, based on the evidence, this was a collateral benefit, incidental to the maintenance of proper environmental conditions for the operation of petitioner's machinery. It is bootstrapping to argue, post hoc ergo propter hoc, that where a collateral benefit necessarily follows an action, that the collateral benefit belies another basis as the justification for the action. See *Westroads; Inc. v. Commissioner*, 69 T.C. 682 (1978). We find petitioner's sole justification for the installation of the HVAC units in its stores was that the HVAC units were essential to meet the temperature or humidity requirements for the operation of its refrigeration equipment, and that the benefit to petitioner's workers and customers was incidental. Thus, we find that pursuant to section 1.48–1(e)(2), Income Tax Regs., petitioner's HVAC units met the exception to the term "structural components."

Section 1.48–1(e)(2), Income Tax Regs., defines central air-conditioning and heating systems as structural components unless the "sole justification" test is met. When such systems are not considered structural components because they meet the sole justification test, they may be considered property in the nature of machinery, and, thus, qualify as tangible personal property without further examination of their inherent permanence.[7]

---

[7] In *Whiteco Industries, Inc. v. Commissioner*, 65 T.C. 664, 672–673 (1975), this Court established a six-question test to determine whether property other than machinery qualifies as tangible

Having found that petitioner's HVAC units are not structural components because they meet the sole justification test, we hold that the units installed in 1977 were tangible personal property under section 48(a)(1)(A), and, therefore, were qualified section 38 property for purposes of investment tax credit. Before we may rule on the HVAC units installed in 1979, however, a final issue of statutory interpretation remains to be examined.

The Energy Tax Act of 1978, Pub. L. 95–618, 92 Stat. 3174, added the language "(other than an air conditioning or heating unit)" to section 48(a)(1)(A). This Court must consider the meaning of this parenthetical language.

On its face, the parenthetical appears to exclude all air-conditioning and heating units from the "tangible personal property" category, including central air-conditioning and heating meeting the sole justification exception in section 1.48–1(e)(2), Income Tax Regs.[8] For aid in determining the meaning of the statutory language, we look to the legislative history, which illuminates congressional intent.

The House Committee on Ways and Means proposed the amendment to section 48(a)(1)(A), in the same language in which it was enacted, as a part of the measures that became the Energy Tax Act of 1978 (act). The report of the House Committee on Ways and Means (Ways and Means report) H.R Rept. 95–496, at 124 (1978), 1978–3 C.B. (Vol. 2) 71, 77, which accompanied the proposed act, characterized the act as: "an effort to curtail the rate of growth of domestic energy consumption." The Ways and Means report (1978–3 C.B. (Vol. 2), at 186) explained the amendment to section 48(a)(1)(A) as follows:

Under the committee bill several tax incentives would be repealed for new investments in certain energy property. In particular, the committee bill deletes air conditioning and space heating units (that is, those not considered structural components) from the definition of tangible personal property so that such property no longer will be eligible for the regular investment tax credit.

---

personal property for purposes of the investment tax credit. Respondent adopted this test. Rev. Rul. 80–151, 1980–1 C.B. 7, 8. We believe that even if this test were applicable in the instant case, petitioner's HVAC units would meet the six criteria.

[8] For a discussion of the problems in interpreting the sec. 48(a)(1)(A) parenthetical, see Bradley & Oliver, "Investment Tax Credit: The Illusory Incentive," 2 Va. Tax Rev. 267, 304–310 (1983).

The Senate version of the act did not contain the parenthetical amendment to section 48(a)(1)(A). The Conference report, S. Rept. 95–1324 (Conf.), at 67 (1978), 1978–3 C.B. (Vol. 2) 309, 339, however, adopted the amendment, stating that under the House version: "Portable air conditioners and space heaters would also be ineligible to receive the investment credit." The Conference report, *supra*, goes on to state that the "conference agreement generally follows the House provision," and that it applies "only to portable air conditioners, portable space heaters and boilers fueled by oil or gas."

The Joint Committee on Taxation, Summary and Section-by-Section Explanation of Title II of H.R. 8444, 95th Cong., 1st Sess. 29 (1977), (Joint Committee report) states that: "Under this provision, the regular investment credit is denied for portable air conditioners and heaters, which tend to use energy inefficiently."

Although the language in the Ways and Means report appears ambiguous, when combined with the statements in the Conference report and the Joint Committee report, it is clear that Congress intended to exclude only portable air-conditioning and heating units from section 48(a)(1)(A). Though noting that the term "portable" was not defined, respondent has acknowledged that Congress intended this provision to apply only to portable units. See Rev. Rul. 81–240, 1981–2 C.B. 11. This Court took note of the congressional intent behind the provision in *Circle K Corp. v. Commissioner, supra* at n. 7.

The language in the Ways and Means report regarding units considered to be structural components indicates that Congress intended that the units excluded are those commonly thought of as portable air-conditioners and space heaters. Congress did not seek to exclude central air-conditioning and heating units that would be considered structural components but for the "sole justification" exception. This intent is in line with the articulated policy of the act, to discourage the inefficient usage of energy.

In the instant case, petitioner did not establish that the HVAC units upon which it claimed the investment tax credit for the fiscal year 1979 were placed in service prior to September 30, 1978. The HVAC units, however, were not what are commonly considered portable air-conditioners or heaters.

Though movable, the HVAC units would have been considered structural components if they had failed to meet the sole justification exception. See *Kramertown Co. v. Commissioner, supra.* Thus, we find that the HVAC units were not excluded from the definition of tangible personal property. We hold that the HVAC units petitioner installed in 1979 were also tangible personal property under section 48(a)(1)(A), and, therefore, were qualified section 38 property for purposes of the investment tax credit. We have considered respondent's other arguments and find them unpersuasive.

Based on the foregoing,

*Decision will be entered under Rule 155.*