T.C. Memo. 1998-225


UNITED STATES TAX COURT


RICHARD J. AND CAROL C. SPERA, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 130-97.                          Filed June 25, 1998.


        C, the wholly owned corporation of H, constructed
a building on land owned by H and W (Ps).  R determined
and argues that the expenditures for this building are
constructive dividends to Ps.  Ps argue that the land
was leased to C and that the expenditures were not
constructive dividends to them.
        <u>Held</u>:  Because the expenditures were made with the
primary intention and result of conferring a benefit on
Ps, C's expenditures are constructive dividends to Ps
to the extent of C's earnings and profits.
        <u>Held</u>, <u>further</u>, Ps are liable for the accuracy-
related penalties determined by R under sec. 6662(a),
I.R.C., to the extent described herein.


<u>James J. Mahon</u>, for petitioners.

<u>Monica E. Koch</u> and <u>Andrew Mandell</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:  Respondent determined deficiencies in the respective amounts of $60,907, $72,128, $77,072, and $8,243 in petitioners' 1989 through 1992 Federal income tax, an addition to tax under section 6651(a)(1) for 1989, and accuracy-related penalties under section 6662(a) for 1989 through 1992.  Following concessions by both parties, we must decide:  (1) Whether petitioners received constructive dividends in the amounts of $27,941, $160,780, $53,001, and $15,585 in 1989 through 1992, respectively, as a result of expenditures made by General Refining and Smelting Corp. (GRC), Richard J. Spera's (Mr. Spera) wholly owned corporation; and (2) whether petitioners are liable for accuracy-related penalties under section 6662(a) for 1989 through 1992.  Unless otherwise stated, section references are to the Internal Revenue Code in effect for the years in issue.  Rule references are to the Tax Court Rules of Practice and Procedure. Dollar amounts are rounded to the nearest dollar.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.  When the petition was filed, petitioners resided in Northport, New York.  For the years

in issue, petitioners filed Forms 1040, U.S. Individual Income Tax Return, using the filing status of "Married filing joint return".

In 1980, petitioners acquired title to approximately 140 acres of real property (the Ashland property).  The property is located in Ashland, New York, in the Catskill Mountains and within 15 minutes of a ski area called Ski Windham.  At the time of purchase, a small farmhouse and garage were located on the property.  Petitioners have since used the house as a vacation home.

Mr. Spera, a metallurgical chemist by trade, was the sole shareholder of GRC.  During the years in issue, GRC's operations were located in a building in Hempstead, New York (the Hempstead Building).  GRC, incorporated on August 2, 1977, was in the business of assaying and melting precious metals.  GRC's assaying business consists of ascertaining the weight and the purity of gold and silver.  The melting business consists of liquefying metal.  GRC also conducts a sweeps operation out of the Hempstead Building.  The sweeps operation services customers in the manufacturing, jewelry, and electronics fields.  These businesses use precious metals and create a byproduct of waste materials.  GRC burns, crushes, sieves, assays, and sends these waste materials to a smelter.  GRC filed its 1987 through 1994 Forms

1120, U.S. Corporation Income Tax Return, based on a taxable year ended on July 31.

In or around 1987, Mr. Spera and GRC entered into a lease agreement. In 1990, petitioners ascertained that they had lost their copy of the original lease and that Larry Gardner (Mr. Gardner), the attorney who prepared the original lease, had also lost his copy. Petitioners asked Mr. Gardner to prepare a replacement lease that embodied the terms of the original lease, and he did. Under the replacement lease, dated June 11, 1990, petitioners leased approximately 1.28 acres of the Ashland property to GRC from September 1, 1987, to August 31, 2037, for an annual rent of $1,200 payable in equal monthly installments. GRC is obligated to pay, as additional rent, "all sums required for Town Taxes, School Taxes, land scaping [sic], building maintenance and snow removal." Under the terms of the lease, GRC is given an option to renew the lease upon the same terms as set forth therein for an additional term of 50 years, and an option to purchase the property at a price to be agreed upon. The replacement lease also provided that GRC "shall be allowed to construct a two story building with basement upon the subject premises". The building's purpose is not identified in the replacement lease. Petitioners signed the agreement as the lessors, and Lori Romandi (Ms. Romandi), an employee of GRC,

signed in an unidentified capacity for GRC, the lessee.  Neither the original lease nor the replacement lease was recorded.

On August 20, 1987, an application, signed by Mr. Spera, was made to the building department, Town of Ashland, for the issuance of a building permit.  The application identifies the address of the proposed building as "1 Mile North - Mail Route Road - West Side".  The application identifies the intended use of the building as "farm and storage", the total cost of construction at $65,000, and "Huntersfield" as the contractor. The Town of Ashland approved the building permit application and issued a building permit on August 31, 1987.

Sometime thereafter, Huntersfield, Ltd. d/b/a/ Lewis Creek Group (Huntersfield), incorporated on October 8, 1987, started construction on the Ashland Building.[1]  For 1989 through 1992, GRC paid $27,941, $160,780, $53,001, and $15,585, respectively, for construction-related expenses on the Ashland Building.  All construction, including electrical work, was completed on the Ashland Building as of August 1995, and a certificate of occupancy was issued by the Town of Ashland on August 22, 1995. The certificate of occupancy identifies the type of property as "commercial and residential year round".  The Ashland Building consists of three floors.  Each floor is approximately 2,400

---

[1] From 1987 to 1992, Mr. Spera and Timothy Abresch (Mr. Abresch) were each 50-percent owners of Huntersfield.

square feet:  The first floor is primarily of concrete construction; the second floor is of timber construction; and the third floor is of timber construction on the outside with cedar interior wood.  From August 1996 to date, petitioners have resided in the Ashland Building's third floor living quarters; and as of February 1998, the first floor of the Ashland Building is being used as an operational precious metals melting facility.

Petitioners did not report any rental income on their 1987 through 1995 tax returns.  From 1987 through 1990 and 1992 through 1997, petitioners paid all property tax bills on the Ashland property as follows:  $221 in 1988; $2,116 in 1989; $2,422 in 1990; $3,326 in 1992; $3,446 in 1993; $3,448 in 1994; $3,487 in 1995; $3,409 in 1996; and $3,538 in 1997.  For the period July 1, 1988, through June 30, 1990, petitioners paid $1,247, $2,419, and $2,803, respectively, for school taxes on the Ashland property.

For its taxable years ended July 31, 1988 through 1990, GRC's Forms 1120 report other assets relating to construction in progress in the respective amounts of $233,784, $281,785, and $381,300.  For the taxable year ended July 31, 1991, GRC reported only $7,059 in other assets relating to construction in progress. Its buildings and other depreciable assets were increased from $397,591 to $860,328.  Under its depreciation summary, GRC showed a building placed in service on August 1, 1990, with a basis of

$462,737.  For the taxable year ended July 31, 1992, GRC reported an increase in its buildings and other depreciable assets to $925,865, of which $60,755 was attributable to a building improvement placed in service on January 2, 1992.  For the taxable year ended July 31, 1993, GRC reported an increase in its buildings and other depreciable assets to $927,448, of which $1,538 was attributed to building improvements placed in service on January 1, 1993.  For the taxable year ended July 31, 1994, GRC reported a decrease in its buildings and other depreciable assets to $923,115; however, $6,124 was shown expended for building improvements placed in service on February 15, 1994.  On its returns for the taxable years ended July 31, 1988 through 1993, GRC deducted the following amounts for real estate taxes paid:  $0; $0; $0; $510; $6,314; and $6,934.

During the years in issue, GRC made the following payments to Mr. Spera:  In 1990, $4,786 for taxes on the "barn"; in 1991, $3,005 for reimbursement of taxes paid on the "barn"; in 1992, $8,054 for taxes on "Ashland".  From 1989 through 1998, GRC maintained insurance coverage with Hartford Fire Insurance Co. On various applications for insurance, insurance policies, amendments, and riders, the Hempstead Building was identified as a refining operation and/or a precious metals refinery, and the Ashland Building was identified as an office building and/or other eligible professional offices.

The parties failed to stipulate to GRC's earnings and profits during the years in issue. GRC's retained earnings for the taxable years ended July 31, 1987 through 1994, were $369,761, $373,543, $364,065, $319,616, $172,301, $209,367, $251,649, and $336,591, respectively. The retained earnings do not account for constructive dividends in the respective amounts of $101,725 and $162,384 imputed to petitioners in their 1987 and 1988 tax years, or for petitioners' concession that they received constructive dividends in 1989, 1990, and 1992 in the respective amounts of $117, $1,735, and $445. Other than the constructive dividends imputed to petitioners in 1987 and 1988 and petitioners' concession, GRC did not pay any dividends from 1987 through 1992.

In the notice of deficiency, dated October 7, 1996, respondent determined, among other things, that petitioners received constructive dividends based on building additions in the amounts of $28,058, $170,801, $133,541, and $16,009, respectively, for 1989 through 1992. The expenditures, emanating from the building additions, which remain in dispute for 1989 through 1992 are $27,941, $160,780, $53,001, and $15,585, respectively.

                            OPINION

The primary issue we must decide is whether construction expenditures made by GRC constituted constructive dividends to

petitioners.  Respondent argues that the purported lease agreement between petitioners and GRC was not negotiated at arm's length, that the lease should be disregarded, and that the money GRC expended on the Ashland Building should be treated as constructive dividends to petitioners.  Petitioners argue that section 109 specifically removes the expenditures at issue from the definition of gross income, and that GRC's expenditures are thereby not income to petitioners.  Petitioners bear the burden of proving respondent's determination wrong.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

I.  Economic Reality and The Lease Agreement

As a general rule, improvements made by a lessee to a leasehold estate do not result in the realization of income by the lessor in the year of the improvement or upon termination of the lease.  Sec. 109; M.E. Blatt Co. v. United States, 305 U.S. 267 (1938); Bardes v. Commissioner, 37 T.C. 1134 (1962); Weigel v. Commissioner, T.C. Memo. 1996-485.  However, this rule and the case law developed thereon do not apply where the lease agreement is determined to be a subterfuge or a sham.  Commissioner v. Court Holding Co., 324 U.S. 331 (1945); Jaeger Motor Car Co. v. Commissioner, T.C. Memo. 1958-223, affd. 284 F.2d 127 (7th Cir. 1960).  Therefore, as an initial matter, we must ascertain whether the lease arrangement between GRC and petitioners has any economic reality and should be respected for tax purposes.

Because transactions between shareholders and their closely held corporations are easily manipulated, we examine such a transaction with special scrutiny. See <u>Electric & Neon, Inc. v. Commissioner</u>, 56 T.C. 1324, 1339 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974). We evaluate the realities or substance of the transaction and are not bound by the form the transaction may take. <u>Commissioner v. Court Holding Co.</u>, <u>supra</u>; <u>Higgins v. Smith</u>, 308 U.S. 473 (1940). Specifically, when evaluating a lease arrangement between a taxpayer and his wholly owned corporation, we consider not only the lease itself, but also the testimony of witnesses and the surrounding circumstances. See <u>Weigel v. Commissioner</u>, <u>supra</u>.

Based on our detailed review of the record, we conclude that there was no economic reality behind petitioners' and GRC's lease agreement and that section 109 and <u>M.E. Blatt Co. v. United States</u>, <u>supra</u>, are inapposite. First, we find that the terms of the lease are not commercially reasonable. We do not believe that a lessee dealing at arm's length would agree to rent property worth approximately $4,000 for 50 years of equal payments totaling $60,000. Indeed, such a stream of payments would constitute a 30-percent annual return to the lessor over the 50 years, exclusive of any appreciation on the underlying

land and without consideration of any improvements made thereon.[2] Further, the option to rent the land for an additional 50 years contains no provision for a corresponding increase in rent or reference to establishing the rent in accordance with a then-current fair rental value, and the option to purchase the land contains no terms or objective measurement by which to do so.  We also find that Mr. Spera and GRC did not take adequate steps to determine the fair rental value of the 1.28 acres of land.  Among other things, Mr. Spera made no effort to determine what the prevailing rental rate was for similar parcels of property in the same locale.  See Weigel v. Commissioner, supra.

Second, we find that GRC and petitioners did not intend to honor the terms of the lease.  GRC did not pay and petitioners did not receive any rent during the years in issue.[3]  We also note that, contrary to the lease, petitioners paid all town taxes, school taxes, and other expenses for 1987 through 1992.[4]

---

[2] We have calculated this 30-percent return using basic present value formulae.

[3] Petitioners argue that the parties to the lease never intended for rental payments to commence prior to the issuance of the certificate of occupancy.  Further, petitioners claim that GRC began making rent payments in 1995, after the certificate of occupancy was issued on Aug. 22, 1995.  Given the fact that no rental receipts were reported on petitioners' 1995 Federal income tax return, we are not persuaded by petitioners' argument.

[4] Although the record shows that GRC did make a series of payments to Mr. Spera during 1990 through 1992 for the stated purpose of paying taxes on a "barn" and "Ashland", we are unable
(continued...)

And third, we reject petitioners' argument that numerous business reasons and corporate meetings demonstrate that there was a valid lease between GRC and petitioners. For example, Mr. Spera cited numerous business reasons for the relocation of GRC's refinery operations to include: Rental and utility costs incurred by GRC for the business premises located in Hempstead, New York, were extremely high relative to rental and utility costs in other areas in New York outside of the New York metropolitan area; and GRC could operate much more efficiently and profitably by moving to an upstate New York location. However, for the years at issue and thereafter, GRC continued to pay rent for the Hempstead Building. Mr. Spera testified that this fact is not inconsistent with the stated business purpose; but instead naturally arises from the fact that the completion of the Ashland Building was delayed due to a severe economic downturn in GRC's business. We do not assign any weight to petitioners' argument. Although GRC's gross receipts declined from the taxable year ended July 31, 1988, to taxable year ended July 31, 1994, GRC's gross profits and taxable income increased significantly. Mr. Spera's proffered business reasons are

[4](...continued)
to find that these payments were indeed payment of taxes under the terms of the lease. GRC's Federal income tax returns do not reflect a corresponding deduction for real estate taxes paid, and petitioners have not demonstrated that GRC's deductions for rent paid include payment of taxes on the Ashland Building.

nothing more than after the fact self-serving espousals designed to make the lease seem bona fide.

II.  Constructive Dividends

As a result of our finding that there was no economic reality behind GRC's and petitioners' lease agreement, we now turn to the question of whether GRC's construction expenditures constitute constructive dividends to petitioners.  Section 61(a)(7) includes dividends in a taxpayer's gross income. Section 316(a) defines dividends as any distribution of property made by a corporation to its shareholders out of its earnings and profits.  Section 1.317-1, Income Tax Regs., provides that "the term 'property' * * * means any property (including money, securities, and indebtedness to the corporation) other than stock, or rights to acquire stock, in the corporation making the distribution."  Where a corporation confers an economic benefit on a shareholder without the expectation of repayment, that benefit may be a constructive dividend, taxable to the shareholder.  See sec. 61(a)(7); Fields v. Commissioner, T.C. Memo. 1996-425.

Construction services performed by a corporation which improve property owned by its shareholder may constitute a constructive dividend.  Magnon v. Commissioner, 73 T.C. 980 (1980).  Likewise, transfers between related corporations can result in constructive dividends to their common shareholder if

they were made primarily for his or her benefit and if he or she received a direct or tangible benefit therefrom.  Gilbert v. Commissioner, 74 T.C. 60, 64 (1980); Schwartz v. Commissioner, 69 T.C. 877, 884 (1978).  The amount of the constructive dividend reflects the benefit conferred on the shareholder.  Nicholls, North, Buse Co. v. Commissioner, 56 T.C. 1225, 1238 (1971).

The crucial test of the existence of a constructive dividend is whether "the distribution was primarily for shareholder benefit."  Loftin & Woodard, Inc. v. United States, 577 F.2d 1206, 1215 (5th Cir. 1978); Sammons v. Commissioner, 472 F.2d 449, 452 (5th Cir 1972), affg. in part, revg. in part, and remanding T.C. Memo. 1971-145; Truesdell v. Commissioner, 89 T.C. 1280, 1295 (1987); Magnon v. Commissioner, supra at 994.  To make this determination, we look at all the facts and circumstances surrounding the expenditures, including the nature of the building improvements and evidence that the shareholder benefited from the corporate expenditures.

Based on the record at hand, we conclude that petitioners received a direct economic benefit from GRC's construction expenditures.  First, as to the nature of the improvements, each party presented an expert to opine on whether the Ashland Building was constructed for use as a metals refinery.  We were unimpressed with both experts and do not accept either expert's characterization of the nature of the improvements as

dispositive. See <u>Helvering v. National Grocery Co.</u>, 304 U.S. 282, 294-295 (1938); <u>Estate of Cloutier v. Commissioner</u>, T.C. Memo. 1996-49. They both based their opinions on personal observations which were made at least 3 years after the last year in issue, and subsequent modifications may have altered the building's features.[5] Both experts also made key concessions on cross-examination.

Certain features of the Ashland Building indicate that the building was not constructed for the benefit of GRC, but was instead constructed for purposes that are personal to petitioners. The first floor has no bathrooms, and one must exit the building to use the restroom facilities on the third floor. Petitioners have failed to show how this design adequately accommodates industrial workers who must have ready access to wash basins and restroom facilities. The third floor contains a balcony, a wine storage facility, and four bedrooms with four bathrooms (each equipped with its own bathtub). Among other things, we conclude that there was no business purpose to be served from the installation of a wine storage facility. Mr. Spera also conceded at trial that petitioners have resided in

---

[5] GRC's current use of the Ashland Building for its melting operation does show that the building was indeed adaptable for use as a refinery. It does not demonstrate that the parties intended to use it as such. Our inquiry focuses on petitioners' intent and use during the years in issue, and later modifications which adapt the building's use are not persuasive.

the Ashland Building's third floor living quarters from August 1996 to date. This fact is relevant to the extent it sheds light on petitioners' intent to use the Ashland Building as a personal residence during the years in issue. Therefore, we find that the nature of the improvements indicates that the Ashland Building was built, in part, for petitioners' personal benefit.[6] Cf. Weigel v. Commissioner, T.C. Memo. 1996-485 (improvements made to obtain necessary rezoning for business).

Second, the record is replete with evidence that corporations other than GRC utilized the Ashland Building as their principal place of business during the years in issue, and petitioners have failed to show that they were not benefited directly from this use. Documents generated by Huntersfield show its principal place of business as the Ashland Building. For example, Huntersfield issued invoices to Hi-Tek Chemical Corp.[7] (Hi-Tek) in late 1988 and early 1989 showing accounts receivables of $7,004, $860, $250, $660, $431, and $323 for work done on "the farm". The invoices identify both Huntersfield's and Hi-Tek's address as Rd 1, Box 70, Prattsville, NY 12468, the Ashland

---

[6] We recognize that part of the Ashland Building is suitable for industrial usage. However, we have no basis for apportioning the construction expenditures.

[7] Hi-Tek, incorporated on Jan. 28, 1980, is the manufacturer of an antifouling coating system used in conjunction with marine and fresh water fouling problems. Mr. Spera was originally its sole shareholder; since 1990, he and Joseph M. Wentzell are each 50-percent shareholders in Hi-Tek.

Building's address.  In addition, Mr. Spera made representations to third parties that the Ashland Building was Huntersfield's primary place of business:  On a December 8, 1987, application package to New York State Electric & Gas for electric service to the Ashland Building, signed by Mr. Spera, the business and customer name identified for billing purposes is Huntersfield; in a petition for the judicial dissolution of Huntersfield, Mr. Spera stated that the principal place of business of Huntersfield was the Ashland Building.  An admission by Mr. Spera also supports respondent's argument that other entities used the Ashland Building.  Peter Toporowski, a revenue agent, testified that in July 1993 he inspected a three-story building on the Ashland property, and that on the first floor he observed leftover construction equipment, a bulldozer, a workbench, and tools.  In response to Mr. Toporowski's inquiry as to who owned the aforementioned equipment, Mr. Spera stated that the equipment belonged to a couple of dissolved corporations.  At trial, Mr. Spera claimed, among other things, that GRC charged Huntersfield rent for the storage of construction materials and that Huntersfield's offices were located elsewhere.  However, other than Mr. Spera's unsubstantiated testimony, petitioners presented no supporting documentation or testimony.  Moreover, while GRC's depreciation of the Ashland Building is seemingly consistent with its ownership and use of the Ashland Building,

the timing of the depreciation deductions raises questions regarding GRC's intended use of the Ashland Building and who was actually using the building during the years in issue. Depreciation deductions may not be claimed until an asset is placed in service. Rybak v. Commissioner, 91 T.C. 524, 561 (1988); sec. 1.167(a)-10(b), Income Tax Regs. An asset is first placed in service when it is placed "in a condition or state of readiness and availability for a specifically assigned function". Sec. 1.167(a)-11(e)(1)(i), Income Tax Regs.; see also Cooper v. Commissioner, 542 F.2d 599, 601 (2d Cir. 1976), affg. per curiam T.C. Memo. 1975-320; Piggly Wiggly S., Inc. v. Commissioner, 84 T.C. 739, 745-746 (1985), affd. on another issue 803 F.2d 1572 (11th Cir. 1986). The Ashland Building was apparently placed in service, substantially complete and available for occupancy, on August 1, 1990, with later related building improvements placed in service on January 2, 1992, January 1, 1993, and February 15, 1994. However, petitioners claim that GRC has utilized the Ashland Building as its corporate headquarters and for record storage since 1995, and that GRC has used the building as an operational precious metals melting facility since February 1998. Given these facts, we conclude that an entity, other than GRC, utilized the Ashland Building during the years in issue.

And third, we find numerous inconsistencies between GRC's stated intent to use the Ashland Building as a refinery and other

evidence in the record.  First, the building permit application identifies the intended use of the Ashland Building for farm and storage.  Second, the August 22, 1995, Certificate of Occupancy identifies the type of property as "commercial and residential year round".  Third, the insurance records for the Ashland Building do not reflect an intent to use the structure as a melting facility.  Nancy Weingartner, an employee of the Hartford Insurance Co. and underwriter for the Hempstead and Ashland properties, testified that the business listed for the Hempstead property is that of general refining and smelting and the business listed for the Ashland property was that of an office.

Petitioners attempt to explain these inconsistencies.  As to the building permit application, Mr. Spera stated in a sworn affidavit that, in obtaining the building permit, the builder misidentified the intended use of the Ashland Building as farm and storage.  He further testified that he did not complete the building permit application, nor did he enter the total cost of the building or its intended use.  Instead, it was Mr. Abresch, the builder and co-owner of Huntersfield, who completed the application after Mr. Spera affixed his signature.  As to the Certificate of Occupancy, Mr. Spera testified that the reference to "residential" referred only to the occasional use of an apartment.  And as to the intended use of the Ashland Building as identified in insurance records, petitioners claim that the

records presented at trial do not reflect a change in classification resulting from the Ashland Building's use as an operational metals refinery as of February 1998. Taken individually, many of petitioners' explanations appear reasonable; however, there are just too many inconsistencies, and we do not find Mr. Spera's testimony persuasive.

Under current law, the burden is on petitioners to show that GRC, and not petitioners, was the primary beneficiary of GRC's expenditures. For the aforementioned reasons, petitioners have failed to carry that burden, and we therefore conclude that the payments for the costs associated with the construction of the Ashland Building were made by GRC with the primary intention and result of conferring a benefit on petitioners. Accordingly, we find that GRC's expenditures in constructing the Ashland Building were section 301 distributions to petitioners. These distributions are taxable dividends to the extent of GRC's earnings and profits. See sec. 301(c)(1). The amounts received in excess of earnings and profits are a nontaxable return of capital to the extent of Mr. Spera's basis in his stock, with any excess treated as a gain from the sale or exchange of property. See secs. 301(c)(2) and (3), and 316. The parties shall apply this tripartite classification in arriving at their computation under Rule 155.

III.  Section 6662

Respondent determined that petitioners are liable for section 6662(a)'s accuracy-related penalty for 1989 through 1992 because there was a substantial understatement of income tax liability.  See sec. 6662(b)(2) and (d).  In the alternative, respondent determined that petitioners are liable for the negligence penalty under section 6662(a), (b)(1), and (c).[8]

Section 6662(a) imposes an accuracy-related penalty equal to 20 percent of the portion of an underpayment that is due to a substantial understatement of tax or negligence.  A substantial understatement means an understatement which exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1).  The understatement is reduced by that portion of the understatement for which the taxpayer had substantial authority or for which the taxpayer adequately disclosed the relevant facts in the return.  Sec. 6662(d)(2)(B).  In order to avoid the negligence penalty, petitioners must show that they made a reasonable attempt to comply with the provisions of the Internal Revenue Code and that they were not careless, reckless, or in intentional disregard of rules or regulations.

---

[8] In brief, respondent argues only for the imposition of the accuracy-related penalty under sec. 6662(a) and (b)(1) for negligence or disregard of rules or regulations.  We do not interpret this to be a concession by respondent as to the penalty for any substantial understatement of income tax and proceed accordingly.

Sec. 6662(c); see also <u>Allen v. Commissioner</u>, 925 F.2d 348, 353 (9th Cir. 1991), affg. 92 T.C. 1 (1989) (negligence defined as a lack of due care or a failure to do what a reasonable and prudent person would do under similar circumstances).  As to both accuracy-related penalties, no penalty is imposed with respect to any portion of an understatement as to which the taxpayer acted with reasonable cause and in good faith.  Sec. 6664(c)(1). Petitioners must prove that respondent erred in determining that the accuracy-related penalty applied to the years in issue. Rule 142(a); <u>Monahan v. Commissioner</u>, 109 T.C. 235 (1997); <u>Bixby v. Commissioner</u>, 58 T.C. 757, 791-792 (1972).

We primarily address respondent's determination of the accuracy-related penalty for negligence because our decision on that issue is dispositive.  Because petitioners presented no evidence or argument to support a finding that they exercised due care and did what a reasonable and ordinarily prudent person would have done under the circumstances, we find that they are liable for negligence under section 6662(a).  We also note that petitioners presented no evidence or argument to support a finding that they relied on substantial authority, adequately disclosed relevant facts, or acted with reasonable cause and in good faith.  Therefore, to the extent that petitioners had not been liable for the accuracy-related penalty for negligence, they

would have been liable for section 6662(a)'s penalty for a substantial understatement of tax to the extent that the Rule 155 computation indicated that petitioners' understatement of tax exceeded the greater of 10 percent of the amount of tax required to be shown on the return or $5,000.

We have considered all other arguments made by petitioners and found them to be either irrelevant or without merit. To reflect the foregoing and concessions,

<u>Decision will be entered under Rule 155</u>.