JACOB E. GOLDMAN AND JUDITH A. GOLDMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Goldman v. Commissioner
Docket No. 23211-83.
United States Tax Court
T.C. Memo 1988-355; 1988 Tax Ct. Memo LEXIS 383; 55 T.C.M. (CCH) 1490; T.C.M. (RIA) 88355; August 8, 1988. Geoffrey J. O'Connor and Jeffrey L. Glatzer, for the petitioners. Paulette Segal and Carmen Baerga, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: This case has been designated as a test case for a group of docketed cases involving the same major issues resulting from respondent's adjustments to the partnership income tax returns of Family Planning Laboratories ("FPL"). The taxpayers in such cases have agreed to be bound by the disposition of this case with respect to FPL issues. Respondent determined deficiencies in petitioners' Federal income *387 tax for the years and in the amounts as follows: Year
Amount
1975
$ 13,566
1976
$ 36,664
1977
$ 35,688
1978
$ 43,294
1979
$ 29,088
The issues to be decided are: 1) whether FPL's activities were not engaged in for profit within the meaning of section 183; [1] 2) whether the amount of a nonrecourse note may be included in the cost basis of the patents for purposes of determining amortization; 3) whether the interest accrued on a nonrecourse note is deductible for the years in issue; 4) whether certain expenses are deductible for the years 1975 through 1977; 5) whether investment tax credits are allowable in the years 1975 through 1977; and 6) whether for each of the years in issue, a portion of the deficiency constituted a substantial underpayment of tax attributable to a tax-motivated transaction pursuant to section 6621(c). [2]
*388 FINDINGS OF FACT Some of the facts were stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners resided in Westport, Connecticut at the time they filed their petition herein. FPL was organized on November 18, 1975, as a Connecticut limited partnership for the purpose of acquiring the ownership of and technology related to certain U.S. patents for two consumer-oriented devices used for family planning, the Ovu-Guide (originally designated the Family Fertility Indicator) and the Natural Family Planner ("NFP"). The partnership agreement stated that FPL was formed for the purpose of acquiring and commercial exploiting the patents through the marketing and sale of the products and sale or licensing of the patents. Furthermore, the offering memorandum stated that the partnership would "exploit the Patents by manufacturing through subcontractors, and marketing the Family Fertility Indicator and the Natural Family Planner, both domestically and internationally." The Ovu-Guide is a small, handheld mechanical device that provides an individualized schedule for intercourse and abstinence designed *389 to maximize the probability of conception. The Ovu-Guide is designed to help couples have a child or help them plan the birth of a child more precisely. The NFP is a companion product to the Ovu-Guide, designed to reduce the probability of conception by indicating those days of the month when intercourse without a contraceptive device should be avoided. At the time FPL purchased the rights to the products, a prototype had been developed for the Ovu-Guide but not for the NFP. FPL was initially capitalized through the sale in 1975 of limited partnership interests to a group of investors who acquired the interests for a total of $ 2,600,000. The interests were offered for a total purchase price of $ 100,000 per full interest. Jacob E. Goldman ("petitioner") purchased a whole interest in FPL on November 18, 1975. Each purchaser of a full interest invested $ 8,000 cash in 1975 upon consummation of the offering with a balance of $ 92,000 payable in installments of $ 12,500 each on the fifteenth day of each January and June in 1976 through and including 1978, and a final payment of $ 17,000 on January 15, 1979. The obligations to make such payments were evidenced by a series of 6 *390 percent negotiable recourse promissory notes which were, in material part, secured by letters of credit from a bank. The devices were invented and patented by Lawrence Sherman. Sherman transferred his interest in the patents to Cambridge Research and Development Group ("Cambridge") in a series of transfers between 1966 and 1971. Sherman was a general partner of Cambridge during the years in issue. Cambridge was a limited partnership which was formed for the purpose of developing and exploiting inventions with the hope of licensing such inventions to major companies. The patents and technology relating to the products were further developed by Cambridge and were sold by Cambridge to the investors as tenants-in-common. The stated purchase price was $ 7,500,000 payable as follows: 1) $ 48,000 cash 2) Negotiable recourse promissory notes (down payment notes) in the aggregate principal amount of $ 1,462,000 made payable as follows: Amount
Due
$  45,000
January 15, 1977
$ 325,000
June 15, 1977
$ 325,000
January 15, 1978
$ 325,000
June 15, 1978
$ 442,000
January 15, 1979
3) A nonrecourse promissory note in the principal amount of $ 5,990,000 maturing *391 on March 31, 1981. The note provided for one extension to September 30, 1982. Payment of the note was secured by assets of the partnership including equipment and inventory and "all general intangibles including but not limited to the Patents * * *." The note was nonrecourse as to any of the purchasers and/or their assigns. 4) In addition to the above cash, recourse and nonrecourse notes, an amount not to exceed $ 12,500,000 was to be paid by the purchasers to Cambridge if a certain amount of sales of the products were achieved. Immediately after acquisition of their interests in the patents as tenants-in-common, the investors assigned such interests to the partnership and contributed cash and promissory notes as described above in exchange for their respective interests in the partnership and the assumption by the partnership of the nonrecourse note and the obligation to pay the contingent portion of the purchase price to Cambridge. The new nonrecourse note from FPL to Cambridge was due on March 31, 1981, and could be extended to August 31, 1982, with payment of $ 100,000. The nonrecourse note was extended to August 31, 1982, then to August 31, 1984, and finally to August 31, 1986. *392 The $ 100,000 consideration for each extension was a nonrecourse promissory note. To date, no payment has been made on these notes. Furthermore, neither the $ 5,990,000 nonrecourse note nor the interest thereon have ever been paid. A total of $ 1,510,000 out of the $ 2,600,000 which was to be raised by the sale of interests in FPL was paid directly to Cambridge by the partners of FPL. FPL had three general partners: Sidney Klein, Judson Morris and Dr. John Marshall. Klein had a M.B.A. degree from the Wharton School of the University of Pennsylvania. From 1973 to 1975, Klein served as a senior promotion consultant with Glendinning Companies, a marketing consulting firm where his responsibilities for various clients generally included the identification and definition of marketing problems, data gathering, the development of alternative efficient and effective solutions, supervision of marketplace execution and evaluation. Prior to joining Glendinning, Klein was associated with Proctor & Gamble where he was responsible at various times for the promotion and development of all test and national brands in the Packaged Soap and Detergent, and Bar Soap and Household Cleaning Products *393 divisions, as well as individual brands in the Toilet Goods, Food and Paper division of that company. In that position, his main areas of responsibility included the development of marketing and sales promotion budget plans, supervising their proper implementation and execution and the analysis of total company experience with various promotion types as well as the development of new analysis techniques. Klein initially became involved with FPL when a colleague of his at Glendinning, who was a limited partner in Cambridge, introduced him to Lawrence Sherman sometime in early 1975. Prior to his activities with FPL, Klein had never been involved with a limited partnership. From 1975 until October 1977, Klein worked full time as the managing general partner of FPL for an annual salary of $ 45,000. Klein had no role in locating any other general partners or limited partners for FPL. Prior to becoming a general partner, Klein spent approximately 4 months evaluating the patents and the business to be organized around them in an effort to determine the viability of the transactions. Based on his review of the relevant data and his marketing background, Klein believed that sales of *394 the Ovu-Guide could reach a certain level of profitability. Prior to his experience with the Ovu-Guide, Klein had never had a new product fail. Klein was replaced by Roger E. Davis in October 1977. Prior to joining the partnership, Davis had served as Vice President of the Horn & Hardart Company in New York City with responsibility for domestic and overseas acquisitions in joint ventures and for recruitment and development of management for Hanover House, a 1972 acquisition of several mail order businesses. From 1972 to 1974, Davis was President of the Michigan/Ohio Division of Pulte Home Corporation. This division engaged in the development, construction and sales of residential buildings in the midwest. From 1967 to 1972, he served in various executive capacities with Clairol, Inc., a subsidiary of Bristol-Myers Company. Davis received a salary of $ 60,000. Another general partner was Judson Morris. Morris had supervisory responsibilities for the activities of the partnership. At the time he became a partner in FPL, Morris was a senior partner of PGI Advertising, a New York based agency. Prior to joining PGI, Mr. Morris served as Executive Vice President of Marketing *395 for the Gillette Toiletries Division of the Gillette Company where he was responsible for new as well as established products. From 1969 to 1973, Morris served as Vice President of Marketing for Beauty Aids and Director of New Products for Bristol-Myers Products Division of Bristol-Myers Company. Prior to that, he had been the Director of New Products for the Clairol Division of Bristol-Myers. Morris initially got involved with FPL when Lawrence Sherman approached him when he was still at Bristol-Myers. In 1970, Bristol-Myers acquired from Cambridge an option to manufacture and market the Ovu-Guide. However, Bristol-Myers did not exercise its option. Morris did not leave his position at PGI Advertising in order to serve as a general partner of FPL. His annual salary from FPL was $ 55,000. Morris did not locate any other general or limited partners. Although he testified that he played a leading role in the negotiation of the purchase price of the patents from Cambridge, Morris had no files or memoranda from those meetings. The third general partner was Dr. John Marshall. During the years in issue, Dr. Marshall was a Professor of Obstetrics and Gynecology at the U.C.L. *396 A. School of Medicine and was also Chairman of the Department of Obstetrics and Gynecology of Los Angeles County Harbor General Hospital. Dr. Marshall served as a senior investigator in the National Institute of Health ("NIH") from 1963 to 1969 where he worked in the area of fertility and sterility. Prior to that time, he held various faculty positions at George Washington University Medical School and at the University of Pennsylvania School of Medicine. Additionally, since approximately 1972, Marshall has served as an examiner for the American Board of Obstetrics and Gynecology which is responsible for certifying physicians after they have completed their residency. Dr. Marshall became involved with the Ovu-Guide in the late 1960's through an associate at NIH, who was a friend of Lawrence Sherman and who introduced Marshall to Sherman. Dr. Marshall worked with Sherman in developing the Ovu-Guide, and he later became a limited partner in Cambridge. At the time he became a partner in FPL, Dr. Marshall had a .31 percent interest in Cambridge. Dr. Marshall's interest in Cambridge has never exceeded .50 percent. Dr. Marshall did not leave his position as a professor at the U. *397 C.L.A. School of Medicine in order to serve as a general partner and estimated that the number of hours he spent on partnership activities would not exceed 30 hours per month. Marshall received a salary of $ 10,000 from FPL. When FPL was originally organized, the partners expected to begin production of the Ovu-Guide in mid-1976. However, the partnership experienced unanticipated technical difficulties in manufacturing the Ovu-Guide within the time schedule originally anticipated. The problem was due to an inability to develop a method for continuous three-color printing of information on the 6-foot long rolls of Mylar tape used in the device. Because of these problems, FPL was unable to successfully manufacture an initial inventory of the Ovu-Guides until December 1977. In 1976, FPL entered into agreements with several advertising agencies. The services rendered to FPL included professional medical marketing consultation, promotional recommendations, conducting focus group interviews with consumers and physicians and designing ads for test marketing the Ovu-Guide. It was determined that marketing arrangements for the Ovu-Guide would be initiated by a medical program intended *398 to acquaint physicians with the Ovu-Guide. FPL believed it was important to contact physicians practicing in the area of infertility prior to the time the Ovu-Guide was marketed in order to diffuse physicians' opposition to the product. FPL incorporated Reproduction Research Laboratories, Inc., ("RRL") on September 28, 1976, for the purpose of marketing the Ovu-Guide. In early 1977, RRL began a direct mail campaign aimed at physicians in order to educate them about the availability of the Ovu-Guide. The mailing provided basic information about the product as well as a book, "Conception: A Matter of Timing," which accompanies the product. The mailing also included a response card on which the physician could order the Ovu-Guide and a copy of the book, patient order forms, or physician order forms so that the physician could dispense the Ovu-Guide. In March 1977, FPL conducted its first consumer test market for the Ovu-Guide by running four different ads in the March 1977 issue of "Redbook," a general women's magazine. The ads appeared in 77,500 copies of the magazines in two separate geographic regions. Some ads carried a price of $ 30 for the Ovu-Guide and other carried a *399 price of $ 60. The majority of the ads included a coupon for ordering while others indicated a toll free telephone number for ordering the Ovu-Guide. As of September 1977, those ads had generated sales of 208 units. For these orders, the partnership received a total of $ 7,080. However, due to delays in manufacturing the Ovu-Guide discussed above, the Ovu-Guide was not available for delivery, and all monies collected were returned in full to customers requesting refunds. On December 1, 1977, FPL made an additional offering of limited partnership interests. The offering consisted of 30 limited partnership interests at a price of $ 50,000 per interest for a total of $ 1,500,000. The proceeds of the offering were to be applied as follows: Fees paid to finders
$   150,000
Legal and accounting fees
of the partnership
60,000
Initial inventory of Ovu-Guide
70,000
Clinical studies for Natural
Family Planner
100,000
Molds and Tooling for Ovu-Guide
230,000
Bank fees
180,000
Remaining working capital to be
used for direct response
advertising and promotion
of Ovu-Guide, program of Ovu-
Guide to physicians and
pharmacists, and general
and administrative expenses
710,000
Total
$ 1,500,000
*400 The record does not reflect whether or to what extent the offering was successful. FPL supported its efforts with a public relations program begun in early 1978 with a public relations agency in New York. Articles on the Ovu-Guide appeared in many general interest and women's publications, including an article in the December 1977 issue of "Reader's Digest" which discussed the Ovu-Guide. However, this publicity failed to generate any significant increase in sales and it was discontinued in the fall of 1978. In April 1978, Bartex Medical Inc., of Brea, California was appointed by RRL as the California distributor for the Ovu-Guide and the accompanying book. FPL sold 1,779 Ovu-Guides in 1978 and 1,292 in 1979. As originally planned, FPL's strategy was to develop and introduce the Ovu-Guide first to establish credibility and then to introduce the NFP. The NFP was in a considerably earlier stage of development than the Ovu-Guide. No research had been undertaken to determine the potential market for the NFP, and there were no data to determine a reliable method of birth control. Consequently, FPL planned no test marketing and only limited market studies until clinical testing *401 had been undertaken to determine its efficacy. In the event such tests did not prove favorable, FPL planned to abandon marketing of the NFP in the United States. In 1978, FPL conducted formal consumer focus group studies on the NFP with three groups of married women, including current users of all popular forms of birth control. The results of these studies did not bode well for the NFP and, as a result, FPL suspended further marketing activities for it in the United States. By early 1979, FPL realized that sales volume of the Ovu-Guide was not being built as quickly as had been hoped. Therefore, FPL decided to attempt to acquire a going profitable company on the theory that its cash flow would cover FPL's expenses and allow it to undertake the other testing activities they wished to conduct. Accordingly, in 1979, FPL suspended all marketing investment in the United States in order to concentrate its efforts on making an acquisition. FPL negotiated with a number of companies but was unable to complete an acquisition. In late 1979, FPL established a relationship with a European distributor who planned to market the Ovu-Guide in Italy. Sales results were poor. FPL uses the *402 accrual method of accounting. It amortized the patents using an eight year straight line method of amortization and claimed a basis in the patents of $ 7,500,000. OPINION Respondent argues that FPL did not engage in its activities with respect to the Ovu-Guide and NFP with the intention of making a profit. Therefore, under section 183, the limited partners are not entitled to an investment tax credit and may deduct various expenses and losses only to the extent allowable under section 183. Petitioner disputes the applicability of section 183 to the facts of this case. With respect to the portion of the purchase price evidenced by the $ 5,990,000 nonrecourse note, respondent asserts that the amount of the note may not be included in the cost basis of the patents for purposes of amortization. Further, respondent argues that FPL may not deduct interest accrued on the note because repayment of the note is too contingent and, therefore, the note does not represent a bona fide indebtedness. Petitioner claims that interest deductions are allowable and that the amount of the note is properly includible in the basis of the patents because the note accurately reflected the fair-market *403 value of the patents and, also, because the patients are not the sole security for the note. In the event we conclude that FPL was engaged in an activity for profit, respondent has asserted the alterative argument that FPL is not entitled to deduct certain expenses under section 162 or claim investment tax credits for the years 1975 through 1977 because business operations did not commence until 1978. Petitioner asserts that if the expenses are not allowable under section 162, they are deductible under section 212. Alteratively, petitioner argues that FPL was engaged in a trade or business as of 1977, or that the expenses are deductible as research and development expenses under section 174. Finally, respondent asserts that petitioner is liable for increased interest under section 6621(c) because the transactions at issue were tax-motivated transactions. We deal first with respondent's contention that the activities of FPL were not engaged in for profit. Section 183. [3] In our view, FPL was a profit-oriented activity, albeit an ill-fated one. The general partners responsible for the management of FPL who testified at trial impressed us as credible and intelligent witnesses. *404 Two of the partners had backgrounds in marketing, and one of those partners had successfully introduced numerous new products to the public. The three partners combined gave the partnership the necessary knowledge and experience in marketing, medicine and personal care products. We are persuaded that these partners intended to successfully market the Ovu-Guide and did not engage in these activities solely for tax benefits or personal pleasure. *405 The general partners did not enter into the transaction blindly. Morris had become aware of and familiar with the Ovu-Guide project in the early 1970's when he was still with Bristol-Myers. Marshall had known Sherman since the late 1960's and had assisted in developing the Ovu-Guide. Klein spent a substantial amount of time evaluating the product and its marketability in reaching his decision to become a general partner. Based on his assumptions and calculations, Klein believed this was "his one shot in life to make it big." As it turns out, he was sadly mistaken. Respondent has challenged the methods and figures used by petitioner in estimating the size of the market and sales projections in an effort to undermine petitioner's claims that FPL's activities were profit-motivated. However, testimony at trial and reports of the experts in this case have made it abundantly clear to us that marketing is an inexact science and predictions about the success of a new product cannot be made with a great deal of certainty. The fact that the assumptions used by the partners in predicting future sales of the Ovu-Guide may have been inaccurate, overly optimistic or not statistically rigorous *406 does not, under the fact here, vitiate profit motive. After the purchase of the patents and the formation of FPL, the partners continued to manage the partnership in a businesslike manner. They promptly began investigating potential manufacturers of Ovu-Guides. Additionally, they planned and executed a direct mail campaign to physicians and developed a plan to market the products directly to consumers. In 1977, despite problems in manufacturing, they continued to test market the product and, in fact, some test ads generated sales in that year. The sales volume in 1978 and 1979 did not reach expected levels and in 1980, FPL suspended its advertising campaign in an effort to conserve capital. In late 1979, through a distributor, FPL explored sales potential in foreign markets. For whatever reasons, FPL was unable to achieve the success it had expected with the Ovu-Guide. We are persuaded, however, that the failure was not due to a lack of effort on the part of the general partners. We conclude that the activities of FPL were profit-motivated. The next issue is whether the amount of the nonrecourse note may be included in the partnership's basis in the patents for the purpose *407 of amortization and whether interest deductions may be taken with respect to the note. FPL included in its basis for amortization the $ 5,990,000 nonrecourse note. FPL also deducted interest accrued on the nonrecourse note. The portion of the losses reflected on petitioner's returns for the years 1975 through 1979 attributable to their proportionate share of FPL's deductions for interest on the nonrecourse note and amortization on the nonrecourse portion of the basis of the patents are as follows: Year
Interest
Amortization
1975
$  3,202.89
$ 13,967.76
1976
$ 26,815.55
$ 28,075.06
1977
$ 23,123.80
$ 24,209.90
1978
$ 21,453.30
$ 22,348.13
1979
$ 17,430.18
$ 18,157.20
To be deductible under section 163(a), interest must be paid on genuine indebtedness; that is, indebtedness in substance and not merely form. Knetsch v. Commissioner,364 U.S. 361 (1960). In cases involving nonrecourse indebtedness, the indebtedness is genuine and has substance only if the value of the underlying security bears a reasonable relationship to the amount of *408 indebtedness. Beck v. Commissioner,74 T.C. 1534, 1552 (1980), affd. 678 F.2d 818 (9th Cir. 1982). Section 167 provides that the basis for computing amortization or depreciation is the adjusted basis as provided in section 1011. Section 1011 provides that in determining a loss from a sale or other disposition of property, the basis for such property, as provided in section 1012, is its cost. Where property is acquired by purchase, generally its cost includes the amount of liabilities assumed or taken subject to by the purchaser. Commissioner v. Tufts,461 U.S. 300 (1983); Crane v. Commissioner,331 U.S. 1 (1947); Parker v. Delaney,186 F.2d 455 (1st Cir. 1950); Blackstone Theatre Co. v. Commissioner,12 T.C. 801, 804 (1949). The mere fact that the liability is secured only by the asset transferred and the purchaser otherwise has no personal liability, will not, in and of itself, prevent such liability from being included in the basis of the property. Mayerson v. Commissioner,47 T.C. 340 (1966). *409 While it is clear from the above analysis that a nonrecourse note can be included in the cost basis of an asset, it is well settled that depreciation is based not on mere legal title but on actual investment in the property. Narver v. Commissioner75 T.C. 53, 98 (1980), affd. 670 F.2d 855 (9th Cir. 1982). No such actual investment will exist to the extent of the amount of the nonrecourse note where the stated purchase price of the property securing the note, or the amount of the note, exceeds a reasonable estimate of existing fair market value of the property since the purchaser would be acquiring no equity in the property by making payments and, therefore, would have no economic incentive to pay off the note. Estate of Franklin v. Commissioner,544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975). Accordingly, a determination of the allowance of interest and amortization deduction depends on whether the fair market value of the patents reasonably approximated their purchase price or the amount of the nonrecourse note. Petitioner claims that the purchase price accurately reflects the fair market value of the patents *410 because it was arrived at after "long and arduous" arm's-length negotiations with Cambridge. Petitioner argues that the fair market value must be the price agreed to by Cambridge and FPL because they had adverse economic interests. Fair market value has been defined as the price at which a willing buyer will purchase property from a willing seller when neither party is acting under compulsion and both parties are fully informed of all of the relevant facts. Narver v. Commissioner, supra at 96. However, the price paid is not necessarily determinative as to the value of property where the transaction is based upon peculiar circumstances which influence the purchaser to agree to a price above or below the property's fair market value. Bixby v. Commissioner,58 T.C. 757, 776 (1972). Petitioners have failed to produce any factual support for these arguments. The evidence consists essentially of Morris' testimony that he recalled going to meetings at the New York offices of FPL's attorneys. However, petitioner introduced no minutes of such meetings, no memoranda *411 nor any earlier drafts of agreements. Further, it is not entirely clear that the parties had adverse economic interests. Cambridge set up FPL and located it general and limited partners. Additionally, Marshall, one of FPL's general partners, had a small interest as a limited partner in Cambridge. Finally, we conclude that circumstances did exist which could lead FPL to agree to a purchase price in excess of the fair market value of the patents. Where a large portion of the purchase price consisted of a nonrecourse note, FPL anticipated receiving tax benefits in the form of interest deductions and a high basis for purposes of amortization without suffering any detriment in terms of cash out of its pocket. Accordingly, we are not bound to accept the purchase price as the fair market value of the patents. Both petitioner and respondent presented expert testimony and reports as to the fair market value of the patents. Respondent's expert, David Koffsky, has been in the business of negotiating the licensing of patents for 25 years. Since 1973, Koffsky has served as Vice President of University Patents, Inc., where his responsibilities include evaluating inventions, determining the *412 commercial potential of a new product, setting up new businesses to take products into the commercial marketplace and directly negotiating the licensing of patents. Koffsky is an expert in patent validity and has practiced as a patent attorney before the U.S. Patent Office. He concluded that the fair market value of the patents was approximately $ 100,000. Koffsky's opinion was based on his determination on the following factors: 1) although there was a potential market for the patents, the patents were somewhat limited in scope and might be easily circumvented by competition; 2) the user population would be educated, highly-motivated individuals in a developed country; 3) the potential lifetime for the market was limited; and 4) foreign rights could not be bargained for until there was a track record of domestic rights. Petitioner's expert, Michael A. Goodman, is a management consultant with Dialog Marketing Group, Inc. Goodman reviewed a number of documents primarily relating to the business nature of the transaction, including the limited partnership agreement, the purchase agreement, financial schedules prepared by FPL, tax opinion letters and letters of opinion regarding *413 the market potential for the products. Additionally, Goodman calculated the internal rate of return on an investment assuming a certain level of sales would be reached. He concluded that the purchase price of $ 7,500,000 accurately reflected the fair market value of the patents. The opinions of experts are admissible and relevant to the issue of value, but the opinions must be weighed in light of the expert's qualifications and all other relevant evidence of value. Johnson v. Commissioner,85 T.C. 469, 477 (1985). We may reject expert testimony when, in our best judgment, it is appropriate to do so. Helvering v. National Grocery Co.,304 U.S. 282, 295 (1983); Chiu v. Commissioner,84 T.C. 722, 734 (1985). The testimony in this case, both expert and otherwise, has amply demonstrated the proposition that the meaning of statistics is in the eye of the beholder. While we found both experts to be competent, we are not persuaded by either of their determinations of value. In our opinion, the best evidence in the record as to the value *414 of the patents was the amount of money out of their own pockets these people were willing to risk. Accordingly, we conclude that the fair market value of the patents was the sum of the cash and full recourse notes, or $ 1,510,000. Since the stated purchase price of the patents exceeds their fair market value (to an extent we consider unreasonable), the amount of the nonrecourse note may not be included in the cost basis of the patents. Therefore, the amount of the note may not be included in the basis for purposes of depreciation. Our conclusion that the fair market value of the patents was $ 1,510,000 effectively disposes of the issue as to the interest deductions. As noted above, we have consistently denied interest deductions on nonrecourse debt where the value of the underlying security does not bear a reasonable relationship to the amount of the debt. Estate of Franklin v. Commissioner, supra;Beck v. Commissioner, supra. Petitioner asserts that the note was secured, not only by the patents but by all assets of the partnership. However, petitioner has made no showing that the partnership had other assets sufficient to secure a $ 5,900,000 *415 note. In fact, the evidence is the contrary. Furthermore, the manner in which the patents were purchased effectively drained FPL of its working capital so as to severely limit the likelihood that FPL would possess any other assets unless the Ovu-Guide was successful. Accordingly, we find these arguments unpersuasive. We now turn to the question of deductibility of certain expenses incurred by FPL in the years 1975 through 1977. The partnership claimed deductions for expenses in the years and amounts as follows: 1975
Salaries and Wages
$       400
Payments to Partners
37,083
Rent
300
Interest
85,850
Depreciation
108
Amortization
468,750
Other Deductions
126,350
Total
$   718,841
1976
Salaries and Wages
$    11,680
Payments to Partners
110,005
Rent
4 550
Interest
718,800
Depreciation
521
Amortization
942,233
Other Deductions
231,273
Total
$ 2,019,062
1977
Salaries and Wages
$    12,206
Payments to Partners
97,077
Rent
2,900
Interest
718,800
Depreciation
32,777
Amortization
942,233
Other Deductions
489,607
Total
$ 2,295,678
Respondent's primary position is that these expenses *416 are not deductible under section 162 because they were not incurred in connection with carrying on any trade or business since FPL's activities were not entered into for profit. Alternatively, respondent contends that even if FPL was engaged in business for economic profit, it did not commence operations until 1978 when FPL actually made sales of the Ovu-Guides. Accordingly, any expenses deducted prior to 1978 constituted pre-opening expenses for which deductions are not allowable under section 162. [4]
Petitioner contests that disallowance with a variety of arguments. Petitioner claims that section 162 only prohibits deductions of personal expenses, and since these amounts were clearly not personal expenditures, they should be allowed. Petitioner asserts that business began no later than 1977 because in that year FPL sold copies *417 of the book, "Conception: A Matter of Timing," and the "Redbook" test ads generated sales orders. Petitioner argues that the expenditures are not required to be capitalized because they did not create assets with useful lives in excess of one year. Next, petitioner asserts that the deductions are properly allowable under section 212. Finally, petitioner claims that the expenses are deductible under section 174 as research and development expenses. We note at the outset that we have already concluded that interest expense on the nonrecourse note and amortization attributable to inclusion of the nonrecourse note in the basis of the patents are not deductible in any of the years in issue since the amount of the nonrecourse note unreasonably exceeds the fair market value of the patents and is, therefore, not a bona fide indebtedness. Section 162 provides a deduction for all of the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Because they are not personal expenses does not necessarily mean they were incurred in carrying on a *418 trade or business. It is well settled that pre-opening expenses are not deductible under section 162. Although a taxpayer has made a firm decision to enter into business and has spent time and money in preparation for entering that business, the taxpayer has not "engaged in carrying on any trade or business" within the meaning of section 162(a) until such time as the business has begun to function a a going concern and performed those activities for which it was organized. Richmond Television Corp. v. United States,345 F.2d 901, 907 (4th Cir. 1965), vacated and remanded on other issues 382 U.S. 68 (1965). Applying this rule, we conclude that FPL was not engaged in the trade or business until 1978 when it consummated actual sales of the Ovu-Guide. We are not persuaded by petitioner's arguments that the trade or business commended in 1977 with the sales of "Conception: A Matter of Timing" for two reasons. First, those sales were made as part of the marketing plan for the Ovu-Guide and, second, FPL was not organized for the purpose of entering the publishing business. Moreover, the sales generated by the "Redbook" ads did not, in our opinion, bring *419 FPL into an active trade or business because the ads were run on only a test basis and FPL was unable to fulfill orders for the Ovu-Guide because manufacturing problems delayed production until December 1977. Accordingly, all monies collected from customers were returned in full to those customers requesting refunds, and no gross sales were reported on FPL's 1977 partnership income return. These preopening expenses must be capitalized. See Commissioner v. Idaho Power Co.,418 U.S. 1 (1974). We now consider petitioner's claim that these expenses are nevertheless deductible under section 212. Section 212(2) allows a deduction for all ordinary and necessary expenses paid or incurred for the management, conservation, or maintenance of property held for the production of income. There is no requirement that the taxpayer be in a trade or business. In Hoopengarner v. Commissioner,80 T.C. 538 (1983), affd. in an unpublished opinion 745 F.2d 66 (9th Cir. 1984), [5] we considered the question of the deductibility of certain pre-opening expenses *420 under section 212. There the taxpayer acquired a leasehold interest in a parcel of undeveloped land. The lease required the taxpayer to construct and operate an office building on the premises. The lease was entered into in 1976, although no tenant took possession until 1977. The taxpayer claimed a deduction for rental payments made to the lessor in 1976, which were disallowed as pre-opening expenses. We concluded that although the rental payments were not deductible under section 162, the lease was purchased and held for the production of income and that expenses incurred with respect to property held for the future production of income were deductible under section 212(2). Our review of the facts of this case leads us to conclude that *421 the patents were property acquired for use in a trade or business, not property held for the production of income. Accordingly, Hoopengarner does not control this case. Statements in the partnership agreement and offering memorandum clearly indicate that FPL intended to use the patents to market consumer products in the field of family planning. The partners all made determinations regarding the viability of the business based upon their evaluations of potential sales of the products. There is no evidence that the partnership ever considered exploiting the patents through licensing. The partnership clearly intended to engage in the business of selling fertility devices, and the patents were an integral part of that contemplated business. For the foregoing reasons, we conclude that the patents constituted property to be used in the trade or business of manufacturing and selling Ovu-Guides and NFP's. Therefore, the expense at issue are not the type covered under section 212. Finally, we consider petitioner's argument that the expenses are deductible under section 174 as research and development expenses. *422 Section 174 provides a deduction for research or experimental expenditures paid or incurred by the taxpayer in connection with his trade or business. Section 174(a)(1). The taxpayer need not be currently engaged in a trade or business for the research and experimental expenditures to be deductible. Snow v. Commissioner,416 U.S. 500 (1974). However, the activity for which the deduction is claimed must at some time rise to the level of a trade or business in order for the deduction to be allowed. Levin v. Commissioner,87 T.C. 698 (1986), affd. 832 F.2d 403 (7th Cir. 1987). The definition of research and experimental expenditures includes generally all such costs incident to the development of an experimental or pilot model, a plant process, a product, a formula, an invention, or similar product, and the improvement of already existing property of the type mentioned. However, the term does not include cost of acquiring another's patent. Section 1.174-2(a)(1), Income Tax Regs. Generally, deductions must be taken *423 in the first year in which such expenses are paid or incurred. Section 174(a)(2). We concluded above that FPL's activity constituted a trade or business as of 1978. Additionally, we are persuaded that FPL incurred expenses incident to the development of a product. Therefore, such expenses are deductible under section 174 as set forth below. Petitioner argues that 75 percent of FPL's expenses in 1975 through 1977 qualify as research and development expenses under section 174. However, the partnership return for 1976, FPL claimed as part of an amount labeled "other deductions," $ 54,015 as product research and design. On its 1977 return, FPL claimed as part of an amount labeled "other deductions," $ 714,098 as product research and design. [6] Applying the rule of Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930), and bearing heavily upon petitioner whose inexactitude is of his own making, we will allow petitioner a deduction under section 174 based upon those amounts claimed as research and development expenses on FPL's returns for 1976 and 1977.[6]
*424 The next issue we consider is whether petitioner is entitled to any investment tax credit for the years 1975 through 1977. Petitioners claimed investment tax credit basis for 1975 through 1978 in the following amounts: Year
Credit Basis
1975
$    66
1976
$   163
1977
$ 6,527
1978
$   456
An investment tax credit is available only for property with respect to which depreciation is allowable. Section 48(a). Depreciation deductions are available only with respect to property which is used in a trade or business or held for production of income. Section 167(a). The investment tax credits shown on FPL's returns for 1975 and 1976 were for furniture, fixtures and office equipment. The credits shown on the returns for 1977 were for machinery, equipment and tooling. It is clear that these items constitute property to be used in a trade or business, not property held for the production of income. In this regard, depreciation and investment tax credits are not allowed on assets acquired for a business that has not begun operations. Piggly Wiggly Southern, Inc. v. Commissioner,84 T.C. 739, 743 (1985), *425 affd. 803 F.2d 1572 (11th Cir. 1986). As a general rule, an asset subject to depreciation and the investment tax credit is placed in service when it is acquired and put into use in a trade or business. Madison Newspapers, Inc. v. Commissioner,47 T.C. 630, 633 (1967). Therefore, no credit is allowable for this property since FPL did not place such assets in a trade or business until 1978. Section 6621(c)
Finally, we address the issue of whether petitioner is liable for additional interest under section 6621(c). That section provides for an increase in the interest rate payable under section 6601 with respect to a "substantial underpayment" (defined as an underpayment in excess of $ 1,000), attributable to a tax-motivated transaction. Section 6621(c)(3)(A) enumerates types of transactions which are to be considered "tax-motivated transactions." These transactions include any valuation overstatement within the meaning of section 6659(c). Pursuant to section 6659(c), a valuation overstatement exists if the value of the property, or the adjusted basis *426 of the property, claimed on any return "is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)." FPL claimed a basis in the patents of $ 7,500,000. We determined above that the proper value of the patents for purposes of determining the partnership's basis in them was $ 1,510,000. Clearly, $ 7,500,00 is greater than 150 percent of $ 1,510,000. Accordingly, this constitutes a valuation overstatement within the meaning of section 6659(c). Therefore, petitioner is liable for additional interest under section 6621(c). Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Former section 6621(d) was redesignated as section 6621(c)↩ pursuant to section 1511(c), Tax Reform Act of 1986, 100 Stat. 2744. At trial, respondent moved for leave to file an amendment to answer which raised this issue. We now grant that motion. Respondent bears the burden of proof with respect to this issue. Rule 142(a). 3. SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. Sec. 183(a)
(a) GENERAL RULE. -- In the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. Sec. 183(b)
(b) DEDUCTIONS ALLOWABLE. -- In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed -- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). Sec. 183(c)
(c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED. -- For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212↩. 4. We note that this case does not involve section 195 applicable to amounts paid or incurred after July 29, 1980, in taxable years ending after that date and providing that preopening expenses may, at the election of the taxpayer, be amortized over a period of not less than 60 months beginning with the month in which the taxpayer begins business. ↩
5. But see Fishman v. Commissioner,837 F.2d 309 (7th Cir. 1988), revg. a Memorandum Opinion of this Court; Johnsen v. Commissioner,794 F.2d 1157 (6th Cir. 1986), revg. 83 T.C. 103 (1984); Aboussie v. United States,779 F.2d 424 (8th Cir. 1985). In light of our conclusion, we need not decided as to whether we will continue to adhere to our opinion in Hoopengarner.↩
6. Respondent has conceded that petitioner substantiated that FPL incurred expenses in the amounts listed on its returns which were described as other deductions. ↩