ROBERT V. HURSH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hursh v. Commissioner
Docket No. 16097-86
United States Tax Court
T.C. Memo 1990-184; 1990 Tax Ct. Memo LEXIS 201; 59 T.C.M. (CCH) 339; T.C.M. (RIA) 90184; April 9, 1990
*201 P invested in an electrical power generating windmill system offered in a windpark promotion by C. R audited the promotion, prepared engineering reports on the windmill system, and disallowed all P's deductions and credits for 1982 in a notice of deficiency. P filed a petition with this Court, conducted settlement negotiations with R, and R conceded the merits of the case in full due to the hazards of litigation. P moved to recover litigation costs under section 7430(a). Held, the participation of R's district counsel in an appeals, counsel, and examination (ACE) meeting did not constitute mere "broadbrush" involvement under section 7430(c)(4)(B), but was administrative action or inaction by district counsel upon which this proceeding was based. Held, R's administrative action or inaction prior to district counsel's participation in the ACE meeting is not reviewed in determining whether R's position was not substantially justified; R's position that the transaction lacked economic substance and that the windmill system was not placed in service in 1982, commencing with district counsel's involvement, was substantially justified. John W. Sunnen, for the petitioner. William B. Lowrance, for the respondent. COUVILLION
MEMORANDUM FINDINGS OF FACT AND OPINION COUVILLION, Special Trial Judge: This case is before the Court on the motion of petitioner for litigation costs under section 7430 and Rule 231. [1] Petitioner requested a hearing, however, the Court concludes that a hearing is not necessary for the proper consideration and disposition of this motion. See Rule 232(a)(3). FINDINGS OF FACT Respondent determined deficiencies of $ 1,936, $ 1,618, $ 149, and $ 3,623, respectively, in petitioner's 1979, 1980, 1981, and 1982 Federal income taxes and interest on the deficiencies for *205 1979, 1980, and 1982 at the increased rate under section 6621(c). Petitioner timely filed a petition with this Court on May 27, 1986. At the time the petition was filed, petitioner was a resident of San Diego, California. The deficiencies determined for each year were based on the disallowance of deductions, credits, and credit carrybacks generated by petitioner's investment in a wind turbine electrical power generating windmill system (the windmill system or the system). During 1982, petitioner and two other individuals organized Hursh-Gallardo-Vanemmerick (HGV), a general partnership, for the sole purpose of investing in a windmill system to be located in Kern County, California, at a "windpark" designated as the Cannon Phase I windpark. HGV's acquisition of the windmill system involved (1) the purchase of a fully operational and installed Storm Master Model 12 wind turbine, a windmill tower, and related equipment and wiring; (2) the sublease of a small plot of land upon which the system was erected; (3) a service agreement with the manufacturer of the turbine, Wind Power Systems (WPS), for continuing maintenance; and (4) an electrical power purchase agreement for the sale of *206 electricity generated by the windmill system. The seller of the windmill system, the sublessor of the land, and the purchaser of the electricity was Cannon Financial Group, Inc. (Cannon), the promoter of the windpark. The electricity purchased from investors was immediately resold by Cannon to Southern California Edison Company (Edison). A total of 85 windmill systems were offered in the Cannon Phase I windpark promotion (the Cannon promotion or the promotion). HGV purchased one windmill system in the Cannon promotion and completed execution of all related agreements during 1982. Petitioner, on his 1982 Federal income tax return, deducted and claimed his distributive share of a net loss and investment credit reported by HGV for 1982, which was attributable to HGV's investment in the windmill system. Petitioner then claimed refunds for 1979, 1980, and 1981 arising from carrybacks of the unused portion of the investment credit generated in 1982. Cannon was first notified that the Internal Revenue Service (IRS) would examine or audit the promotion in May 1984. The IRS investigation was undertaken primarily without petitioner's involvement, except for his presentation to the *207 IRS revenue agent of his records and research into the viability of the investment. The investigation by the IRS lasted approximately one and one-half years, during which time the revenue agent obtained evidence and other information which both supported and discredited the validity of deductions and credits generated by the windmill systems. This evidence related to two issues which eventually became the basis for disallowance of deductions and credits set forth in the notice of deficiency: (1) That the transaction lacked economic substance, and (2) that HGV's windmill system had not been placed in service during 1982. The initial evidence and information gathered by the revenue agent included the following: (1) An invoice from Edison which stated that power had been purchased from the windpark for the period December 21, 1982, through February 17, 1983. (2) Letters from Cannon and Edison which stated they could not produce any records showing the dates individual systems were tested or had begun producing power. (3) A letter from WPS to Cannon dated January 5, 1983, supported by statements from two WPS officers, which stated that only 30 of the turbines had been "electrified" *208 as of December 31, 1982; that the turbines were in the process of being retro-fitted with tandem brake calipers; and that the remaining units could not be placed "on-line" until power was connected. (4) Statements by the independent contractor and his foreman, who personally wired the systems to Edison's power interconnect, that all 85 systems were "on line" as of December 23, 1982. (5) The building permit posted at the windpark site and completed by the public building inspector which stated that the final electrical inspection had been approved for the windpark, and that all 85 systems were "on line" as of December 23, 1982. (6) Evidence that Cannon had secured loss of income insurance from an independent insurer based on the economic and scientific assumptions of the offering materials. (7) Evidence that petitioner, as well as other investors, had been introduced to this particular investment through State of California publications which actively encouraged investments in windmill systems as an alternative energy source. In April 1985, the IRS issued an engineering report which challenged most of the economic and scientific assumptions used in the Cannon promotion offering *209 materials. The report recomputed annual and cumulative net profit, exclusive of tax benefits, based on corrected assumptions and concluded that the profitability of the investment was dependent upon tax benefits. The primary challenges made by the IRS report were that Cannon overstated electricity sales prices, omitted certain expenses in projecting profitability, overstated power output of the system, and overstated wind speed. The selling prices of electricity were set forth in the power purchase and sales agreement with Edison. Edison agreed to pay for electricity based on certain formulas which took into account whatever its "avoided cost of energy" and "avoided cost of capacity" happened to be at the time. The agreement was for a 25-year term and established minimum prices through 1989. The Cannon promotion revenue projections assumed the minimum contract price of seven cents per kilowatt hour (KWH) for 1983 and increased that price by 15 percent each year for the remainder of the contract term, resulting in prices which greatly exceeded the prices in the contract between Cannon and Edison. The annual 15 percent increases in the promotional materials were based on a 20-year *210 forecast by the California Energy Commission. The IRS report determined that the 20-year forecast was outdated, citing subsequent forecasts, reports, and articles which showed that energy prices were actually expected to decline at the time. Based on this data, in recomputing projected sales prices, the IRS report accepted the minimum contract prices set out in the contract between Cannon and Edison, through 1989, then assumed prices of five cents per KWH for the remainder of the contract term. Next, the IRS report deducted property taxes and interest as additional annual operating expenses. These expenses had been completely omitted from the calculation of annual and cumulative cash flow and net profit by the promotion offering materials. The IRS report projected that interest alone would greatly exceed all other expenses for the first five years of the investment, and by as much as six times all other expenses combined in 1983, falling off to slightly less than the amount of all other expenses combined in 1987. The omission of interest alone represented a reduction of over $ 20,000 in cash flow and cumulative net profit, exclusive of tax benefits. Accordingly, the IRS report *211 determined that these expenses had a significant negative effect on the profitability of the investment. Third, the IRS report challenged the projected power output of the WPS turbine. Cannon had projected power output of the turbine to be 16 KWH at an average wind speed of 16 miles per hour (MPH). The 16 KWH output was derived from a test of the turbine by WPS, the results of which were depicted on a graphical display referred to as a "power curve." The 16 KWH was then multiplied by 8,760 total hours in a year, for a total of 140,000 KWH per year, rounded. This total power output was then multiplied by projected sales prices to arrive at gross revenues. Gross revenues were then reduced by nine percent to reflect down time for maintenance and repairs, and then reduced an additional nine percent to allow for a margin of error. The IRS report determined that Cannon's projected capacity was only theoretical, and that it did not reflect inefficiencies inherent in converting wind power to electricity, such as the transfer of wind energy to mechanical energy, and the transfer of mechanical energy to electrical energy. Accordingly, the IRS report concluded that mechanical inefficiencies *212 and down time combined would result in output of only 30 percent of 140,000 KWH per year, or 42,048 KWH per year. Based on 42,048 KWH per year, the reduced sales prices, and the significant additional expenses, the IRS engineer's recomputation of annual and cumulative net income indicated that the profitability of the investment was wholly dependent upon tax benefits and that it lacked economic substance. In addition to reaching this conclusion based on the recomputed profitability, the IRS report challenged the assumed 16 MPH wind speed. Cannon's 16 MPH average annual wind speed was based solely on a measurement taken at the windpark on a single day. The IRS report took the position that this minimal sampling of wind speeds was statistically incomplete and unreliable, as a result of which the IRS report concluded that the 16 MPH wind speed was totally unsupported. Other important factors relating to wind speed were that the State of California publication upon which Cannon and petitioner relied estimated the range of average wind speeds for the general area to be from only 11 MPH upward, and a Cannon newsletter to investors reported actual wind speeds from May through November *213 1983 at well below a 16 MPH average. The wind speed estimate of 16 MPH was nevertheless made a part of the IRS engineer's profitability calculation, which was therefore considered by the IRS engineer to be a generous estimate of profitability. Because small variations in wind speed have a significant effect on KWH produced by the turbine, the unsupported wind speed provided additional support for the IRS engineer's conclusion that revenues were materially overstated, and that the investment was not a transaction entered into for profit. On August 21, 1985, in the midst of the examination, an appeals, counsel, and examination (ACE) meeting was held, attended by representatives from IRS district counsel, the appeals office, and the examination division. Together, these individuals constituted what was known as the "ACE committee" assigned to the Cannon promotion. The purpose of the ACE meeting was to review information with respect to the Cannon promotion as a whole, and to classify the promotion as a "litigation vehicle issue" (LVI), "settlement vehicle issue" (SVI), or "regular shelter issue" (RSI). See sections 4 and 5, Internal Revenue Manual Supplement 42G-409 (June 10, 1982). *214 [2]An LVI is defined as a tax shelter issue with no litigation hazards where establishing court precedent is important. An SVI is defined as a tax shelter issue which lacks economic reality but is susceptible of settlement or other disposition. An RSI is defined as a tax shelter issue where the examiner cannot support a "not-for-profit" motive and which does not warrant the LVI or SVI classification. The IRS representative from district counsel is charged with making the final decision as to whether a tax shelter is designated an LVI, and ultimately whether the tax shelter will be litigated, but all ACE committee members must agree on the classification. See section 5.02, Internal Revenue Manual Supplement 42G-409 (June 10, 1982). As is the regular practice, the ACE committee did not discuss the case of any individual taxpayer, but rather reviewed the evidence gathered by the revenue agent and made a determination as to the merits of the Cannon promotion as a whole. No decisions were made regarding the issuance of any notice of deficiency. The Cannon promotion was classified by the ACE *215 committee, however, as an SVI, and all members of the ACE committee signed off on the decision, including district counsel. Subsequent to the ACE meeting, the following additional evidence and information was secured by the revenue agent: (1) Analyses by electrical engineers who had invested in the Cannon promotion which reflected a significant return on the investment independent of tax benefits. (2) Letters and statements from these engineer investors, including petitioner, which questioned the credibility of the IRS's engineering analysis. The principal error alleged to have been made was that the projected power output of 16 KWH already expressed power net of mechanical inefficiencies. Accordingly, the IRS's report would have double deducted this factor. In October 1985 petitioner received the revenue agent's report (RAR). The RAR stated that the IRS was taking the position that he was not entitled to the deductions and credits claimed. The positions in the RAR, all in the alternative, were that the investment lacked economic substance, that only *216 29 of the systems had been placed in service in 1982, and that some of the windmill systems were abandoned in 1984, resulting in the recapture of investment tax credits in 1984. The RAR advised petitioner that he could either agree with the disallowance, or he could disagree, in which case he would be afforded appeal rights outlined in Publication 556, a copy of which was attached to the RAR. Petitioner, however, felt that he had reached an impasse with the IRS and decided not to exercise his appeal rights. Accordingly, when he was requested to sign a Form 872A extending the period of limitations on assessment so that his case could be considered by the IRS appeals office, he declined. On November 25, 1985, the revenue agent requested the IRS engineering coordinator to review the accuracy of the IRS's engineering report in light of the criticism from several investors. The response was a second engineering report, dated April 21, 1986, which specifically addressed the errors brought up by the investors, including petitioner, set forth an analysis of why mechanical inefficiencies had to be deducted from the power curve, and projected theoretical upper and lower limits of power *217 output based on such inefficiencies. The theoretical upper limit was slightly higher than the output projections of the first report, but did not warrant a change in the conclusion that the investment lacked economic substance. Further, the IRS report cited other California Energy Commission studies which suggested an average annual wind speed of only 13 MPH for the area which included the Cannon Phase I windpark, serving as additional support for the conclusion that revenues were materially overstated. On November 26, 1985, the revenue agent contacted district counsel and requested language to be used in a notice of deficiency for the Cannon promotion. A copy of the RAR had previously been delivered to district counsel and a second copy was made available at this time. On December 11, 1985, district counsel provided the requested language to the revenue agent. Respondent issued the notice of deficiency to petitioner on March 3, 1986, prior to completion of the second IRS engineering report. The notice of deficiency utilized the exact language provided by district counsel on December 11, 1985. The petition was filed on May 27, 1986. District counsel filed the answer in this *218 case on July 22, 1986. All the Cannon promotion cases in which petitions had been and would be filed, including petitioner's, were referred to the IRS appeals office upon the filing of each respective petition. The appeals officer to whom these cases had been assigned, however, did not begin to work on the Cannon promotion cases until July 1987, due to a heavy workload. Similarly, petitioner made no attempt to contact the appeals officer until June 1987, over one year after his petition was filed. During this one year period, this Court issued a notice setting petitioner's case for trial. Petitioner filed a motion for continuance, unopposed by respondent and subsequently granted, citing as grounds that all of the Cannon promotion cases were being handled by petitioner's attorney, that this attorney had not completed his own investigation and witness interviews, and that no prior efforts had been made to settle petitioner's case. On June 8, 1987, petitioner mailed to district counsel a request for production of documents and answers to interrogatories. District counsel's reply letter proposed a meeting to work out a schedule for production and to discuss some perceived problems *219 with regard to disclosure of certain information. The parties thereafter agreed to meet on August 31, 1987, for this purpose. On August 18, 1987, however, less than two weeks prior to this meeting, petitioner's counsel met with the appeals officer and requested production of documents which he had already requested from district counsel. The appeals officer had been instructed not to provide any documents or information because the discovery meeting with district counsel had already been scheduled. This response was relayed to petitioner's attorney, who, in light of the refusal of the appeals officer, sent district counsel a letter demanding production of all requested information prior to the scheduled discovery meeting and threatening that failure to comply with the request would force petitioner to seek an order from this Court compelling production. District counsel immediately notified petitioner's counsel of its exclusive responsibility for discovery in this case and explained that the refusal by the appeals officer was not an absolute refusal to cooperate, as petitioner's counsel had apparently believed. The August 31, 1987, meeting was held as scheduled, and the parties *220 conducted and completed discovery amicably from that point, resolving district counsel's disclosure concerns. Over the next four months, petitioner's counsel met with the appeals officer to discuss the Cannon promotion cases and to explore possible settlement options. Petitioner's counsel presented to the appeals officer for consideration affidavits from several witnesses, including one witness who had already been interviewed during the initial examination. An additional witness accompanied petitioner's counsel to a meeting and recounted his version of the facts surrounding the Cannon promotion. The following evidence was obtained during consideration of the case by appeals: (1) The affidavit of the building inspector who signed off on the final electrical inspection which stated that the inspector had visually inspected all 85 systems and that they were interconnected to Edison's power grid as of December 23, 1982; that the systems were, therefore, "on line;" and that the term "on line" means only that the systems were wired up and capable of producing power, but not that they were actually operating. (2) The affidavits of two individuals who were directly responsible for *221 the concrete slabs and erection of the systems which stated that all construction work had been completed before December 31, 1982. (3) The affidavit of a Cannon official which stated that he was informed that the systems were "on line" as of December 31, 1982; that the tandem brake caliper retrofit program was an improvement to the fully functional turbines; and that the turbines were originally designed, equipped, and were fully operational with single brake calipers. A project status report from WPS to Cannon, dated January 3, 1983, regarding the retrofit program was submitted with the affidavit. (4) An affidavit from the designer of the WPS turbine which presented additional arguments as to the errors committed by the IRS engineer in projecting power output in both the first and second reports, and which further stated that the IRS never acted upon the designer's invitations to discuss the technical aspects of the turbine. The affidavit alleged that current data on the turbine showed output at almost twice that recomputed by the IRS engineer. The final meeting with the appeals officer was held on December 14, 1987. Over the next two months, the appeals officer reviewed *222 the Cannon promotion cases and researched the issues involved, issues acknowledged by both parties to be novel and uncertain. At the end of February 1988, the appeals officer concluded that the Cannon promotion cases, including petitioner's, should be conceded in full due to hazards of litigation. OPINION In the case of any civil proceeding in a court of the United States, brought by or against the United States in connection with the determination, collection, or refund of any tax, interest, or penalty, the taxpayer may be awarded a judgment for reasonable litigation costs incurred in the proceeding. Section 7430(a). A judgment may be awarded only if the taxpayer is the "prevailing party" and "exhausted administrative remedies available to such party within the Internal Revenue Service." Section 7430(a) and (b)(1). A taxpayer is considered the prevailing party only if it is established that: (1) the position of the United States in the civil proceeding was not substantially justified; *223 (2) the taxpayer has substantially prevailed with respect to the amount in controversy or the most significant issue or set of issues presented; and (3) the taxpayer had a net worth not in excess of 2 million dollars at the time the proceeding was commenced. Section 7430(c)(2)(A). Respondent concedes that petitioner has substantially prevailed in this case. The issues remaining for decision are (1) whether "the position of the United States in the civil proceeding was not substantially justified," (2) whether petitioner had a net worth not in excess of two million dollars at the time the petition was filed, and (3) whether petitioner exhausted administrative remedies available to him within the IRS. The first issue requires the Court to first identify the point in time at which the United States is considered to have taken a position, and second to decide whether the position taken from that point forward was not substantially justified. In Baker v. Commissioner, 83 T.C. 822, 827 (1984), reversed on other issues 787 F.2d 637, 641-642 (D.C. Cir. 1986), *224 this Court held that the United States does not take a "position" in a "civil proceeding" until after the proceeding has commenced. Accordingly, the United States does not take a position in a proceeding before the Tax Court until the proceeding is commenced by the filing of a petition. Baker v. Commissioner, supra at 827; Rule 20(a). The Eighth, Tenth, Eleventh, and District of Columbia Circuits agree, whereas the First, Fifth, Sixth, and Ninth Circuits disagree, requiring pre-litigation positions to be examined as well. See Sokol v. Commissioner, 92 T.C. 760, 764 n.8 (1989), and cases cited therein. Citing the Ninth Circuit decision of Sliwa v. Commissioner, 839 F.2d 602 (9th Cir. 1988), petitioner argues that this Court is required to consider pre-litigation conduct of the IRS because this case is appealable to the Ninth Circuit. See Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Sliwa v. Commissioner, supra, however, involved proceedings commenced before 1986, at which time there was no statutory definition for the phrase "position *225 of the United States in the civil proceeding." Because the proceeding here was commenced after December 31, 1985, this case is governed by the statutory definition provided in section 7430(c)(4): [3]
(4) Position of United States.-The term "position of the United States" includes- (A) the position taken by the United States in the civil proceeding, and (B) any administrative action or inaction by the District Counsel of the Internal Revenue Service (and all subsequent administrative action or inaction) upon which such proceeding is based. *226 Section 7430(c)(4) provides two demarcation points for determining the position of the United States and, more importantly, when that position was taken. First, under section 7430(c)(4)(A), the position of the United States includes "the position taken by the United States in the civil proceeding." Second, under section 7430(c)(4)(B), the position of the United States includes "any administrative action or inaction by the District Counsel of the Internal Revenue Service (and all subsequent administrative action or inaction) upon which such proceeding is based." The Court first considers the applicability of section 7430(c)(4)(A) to this case. The language of section 7430(c)(4)(A) is identical to the previously undefined standard applicable to actions commenced before 1986. Accordingly, in Sher v. Commissioner, 89 T.C. 79, 86 and n. 11 (1987), affd. 861 F.2d 131 (5th Cir. 1988), in light of the addition of a separate provision in section 7430(c)(4)(B) to encompass administrative positions, this Court reaffirmed its view that the identification of the position *227 of the United States, and the corresponding determination of whether such position was not substantially justified, commences with the filing of a petition in the Tax Court. Pre-petition positions are to be considered only within the limits of section 7430(c)(4)(B). Sher v. Commissioner, supra at 86. This Court came to the same conclusion in a subsequent case; however, the Second Circuit disagreed and reversed, holding that the focus for determining "the position of the United States in the civil proceeding" within the meaning of section 7430(c)(4)(A) should be "on the Commissioner's final position as set forth in the statutory notice of deficiency." Weiss v. Commissioner, 850 F.2d 111, 115 (2d Cir 1988), revg. 89 T.C. 779 (1987). Because the Fifth Circuit affirmed the decision of this Court in Sher v. Commissioner, supra, and the Second Circuit reversed in Weiss v. Commissioner, supra, there is a division in the circuits as to whether section 4730(c)(4)(A) encompasses pre-petition positions. In Egan v. Commissioner, 91 T.C. 705, 712 (1988), a Court-reviewed opinion, this Court *228 stated that it would continue to follow Sher v. Commissioner, supra, and not follow the Second Circuit's opinion in Weiss v. Commissioner, supra, except in cases appealable to the Second Circuit. See Golsen v. Commissioner, supra.Petitioner's case is not appealable to the Second Circuit, but to the Ninth Circuit, and is governed by the statutory definition in section 7430(c)(4), unlike Sliwa v. Commissioner, supra.See Egan v. Commissioner, supra at 712 n.3. Accordingly, petitioner's argument that this case is governed by Sliwa v. Commissioner, supra, is rejected. The Court will follow Sher v. Commissioner, supra, in this case. Therefore, under section 7430(c)(4)(A), the United States did not take a "position" in this "civil proceeding" until after the case had been commenced by the filing of the petition, and the decision whether the position taken was not substantially justified is determined from that date forward. In order for the position of the United States prior to filing the petition to be considered, section 7430(c)(4)(B) must authorize *229 it. Under section 7430(c)(4)(B), petitioner must first establish "administrative action or inaction" (also hereinafter referred to as "involvement") by district counsel, and must then prove that such involvement was administrative action or inaction "upon which such proceeding is based." Section 7430(c)(4)(B). The question, therefore, is a determination of the point at which district counsel became administratively involved in the proceedings in this case, and, if district counsel was administratively involved, whether the ensuing proceeding was based on such involvement. Administrative involvement of district counsel can occur before or after the filing of the petition. Sher v. Commissioner, supra at 86. In both Sher v. Commissioner, supra, and Egan v. Commissioner, supra, district counsel did not become involved in the proceedings until an answer was filed in response to the petition. In this case, however, district counsel took *230 administrative action on at least two occasions prior to the time the petition was filed. First, district counsel participated in the ACE committee meeting on August 21, 1985, pursuant to Internal Revenue Manual Supplement 42G-409. Second, district counsel responded to the request of the revenue agent on November 26, 1985, to provide notice of deficiency language for the Cannon promotion cases, including petitioner's. Accordingly, the Court must decide whether this proceeding is based upon such involvement under section 7430(c)(4)(B). Respondent asks the Court to hold that district counsel's participation in the ACE committee meeting did not constitute involvement upon which this proceeding is based because such involvement was "broadbrush" under Weiss v. Commissioner, 89 T.C. 779 (1987), reversed on other grounds 850 F.2d 111, 115 (2d Cir. 1988). In Weiss v. Commissioner, supra, this Court reviewed the scope of district counsel's involvement in a tax shelter project pursuant to Rev. Proc. 84-84, 1984-2 C.B. 782. Rev. Proc. 84-84 sets forth procedures whereby the section 6700/7408 committee, established in each *231 district under Rev. Proc. 83-78, 1983-2 C.B. 595, which is composed of representatives from district counsel, the criminal investigation division, and the examination division, selects tax shelters in which the promoter penalty under section 6700 should be assessed, and identifies situations where an injunction action under section 7408 to enjoin the promoter from promoting abusive tax shelters should be brought. This Court concluded that district counsel's involvement at that stage "does not address individual case procedures or the details of whether a notice of deficiency should be issued" and such involvement was therefore characterized as only broadbrush. Weiss v. Commissioner, supra at 783-784. Accordingly, such involvement was not considered in Weiss to be action or inaction "upon which such proceeding is based" under section 7430(c)(4)(B). On this record, the Court finds that district counsel's participation in the ACE committee meeting in this case was more than just "broadbrush." It is clear that the specific facts, evidence, and information developed to date by the revenue agent were considered in the ACE committee's determination *232 as to the classification of the Cannon promotion. Further, where a tax shelter transaction is concerned, the facts and evidence regarding the tax shelter transaction necessarily relate to the individual cases of each investor. The purpose and operation of the ACE committee, as opposed to the purpose and operation of a section 6700/7408 committee, fully support this conclusion. The duties of an ACE committee, and thus the depth of its involvement in a tax shelter, are much greater and are more specific to the merits of a case than those of a section 6700/7408 committee, as in Weiss v. Commissioner, supra, which is, therefore, distinguishable. The primary function of a section 6700/7408 committee is to determine whether the promoter is subject to penalty or injunctive action. See Weiss v. Commissioner, supra. Further, the section 6700/7408 committee is charged with the task of making section 6700 and section 7408 recommendations on a continuing basis, and not just with respect *233 to a single tax shelter. See Rev. Proc. 83-78, supra at section 3.02. In contrast, there is a single ACE committee created and assigned to a given tax shelter. The only function of any particular ACE committee is to review the particular tax shelter being examined, to determine the position of the IRS with respect to the merits of the transaction, and thus the position of the IRS to be asserted against each individual investor. With respect to taking a position on the issues involved in this proceeding, the action taken by district counsel, as a member of the ACE committee, could not have been more specific. The specific action taken by the ACE committee in this case was to classify the Cannon promotion cases as an SVI. District counsel, therefore, specifically determined that the transaction engaged in by petitioner lacked economic reality, a primary issue in this case. Accordingly, the United States is deemed to have taken a position commencing August 21, 1985, under section 7430(c)(4)(B). Because the Court finds that district counsel became involved on August 21, 1985, the Court need not consider whether district counsel's furnishing of notice of deficiency *234 language on December 11, 1985, constituted the initial involvement. The record fully supports a finding that the proceeding which ensued was based upon district counsel's involvement. Having determined the time from which the position of the United States is to be considered, and that this proceeding ensued upon district counsel's involvement, the Court next considers whether the position taken from that point forward was not substantially justified. The decision whether respondent was not substantially justified turns on a finding of reasonableness. Sher v. Commissioner, supra at 84. A finding regarding reasonableness is based upon all the facts and circumstances, as well as the legal precedents relating to the case. Simply put, the Court must "consider the basis for respondent's legal position and the manner in which the position was maintained." Wasie v. Commissioner, 86 T.C. 962, 969 (1986). The fact that respondent eventually loses or concedes the case, however, does not establish an unreasonable position. Sokol v. Commissioner, supra at 767; *235 Baker v. Commissioner, supra at 828-829. Petitioner has the burden of establishing that respondent's position was unreasonable. Rule 232(e). The record of this case provides a clear chronology of the investigation, the stages at which evidence and information was developed, and the points in time at which information was known to respondent. Although the Court does not consider allegations of action or inaction occurring before August 21, 1985, the reasonableness of respondent's position and conduct necessarily requires considering what respondent knew at the time. Cf. Rutana v. Commissioner, 88 T.C. 1329, 1334 (1987); DeVenney v. Commissioner, 85 T.C. 927, 930 (1985). Respondent's positions which must be considered are (1) that the transaction lacked economic substance, and (2) that HGV's windmill system was not placed in service by December 31, 1982. The Court notes that respondent had also taken a second alternative position in the RAR that petitioner's investment tax credit had to be recaptured in 1984 due to abandonment of the investment. The deficiencies for the years over which the Court has jurisdiction, however, *236 are not based on such a position or theory, and the year 1984 is not before the Court. Accordingly, a decision regarding the reasonableness of that position is irrelevant in this case. The Position That The Transaction Lacked Economic Substance
A decision regarding the reasonableness of respondent's position that the transaction lacked economic substance requires a decision as to the reasonableness of the basis for that position as well as respondent's conduct in maintaining it. The basis for respondent's position regarding economic substance in this case lies in the engineering report. The engineering report in this case was issued in April 1985, prior to the involvement of district counsel, which commenced August 21, 1985. This Court will not review or consider action or inaction of respondent in the development or preparation of that report. Accordingly, petitioner's allegations of error and failure to take certain action in the preparation of that report need not be considered, because such actions or inactions would have occurred prior to August 21, 1985. The report did receive significant criticism, however, and respondent's action or inaction in response to *237 such criticism, beginning August 21, 1985, is relevant in deciding whether respondent's position was reasonable. In reviewing the substance of expert reports for purposes of section 7430, the role of the Court is not to decide whether a particular expert was correct, but to decide whether respondent's overall position, based on such report, was reasonable, considering what was known to respondent about the assumptions made in the report. If there is an honest difference of opinion between experts with regard to the assumptions which form the basis for the report, it cannot be said that respondent's position was unreasonable. Respondent may not, however, blindly rely on an expert's report where the report is based on clearly erroneous assumptions of fact. Minahan v. Commissioner, 88 T.C. 492, 500 (1987). Petitioner contends that this case is analogous to both Frisch v. Commissioner, 87 T.C. 838 (1986), and Gifford Mast v. Commissioner, T.C. Memo. 1989-438. In Frisch v Commissioner, supra at 840-841, respondent *238 relied on an appraisal which was thoroughly discredited at trial. The appraisal assumed that comparable prices for an artist's paintings had fallen after his death when in fact the prices for the paintings had risen. This assumption was maintained by respondent after respondent became aware that it was clearly erroneous, and no steps were taken to investigate or review the validity of the assumptions. In Gifford Mast v. Commissioner, supra, respondent's engineering report determined that the value of an antique glass collection was zero. The taxpayers presented two expert appraisals to respondent's appeals officers which both placed the value at well over one million dollars. Respondent then retained an appraiser who also placed the value at well over one million dollars. Respondent concealed this report from the taxpayers and, four days prior to the call of the case for trial, issued a second report by another appraiser, who did not even examine the collection, which assigned a value of one-half million dollars. In Frisch v. Commissioner, supra , therefore, there was a failure by respondent to take action with respect to obvious *239 contrary factual information, and, in Gifford Mast v. Commissioner, supra, there was action taken in response to contrary information, but the results of the further investigation revealed that respondent's position was erroneous, yet respondent did not abandon its erroneous position. The case here is clearly distinguishable. First, in response to the criticism of the initial IRS report, the revenue agent requested a review by the IRS engineering coordinator. It is clear, therefore, that the revenue agent did not ignore evidence, statements, or criticism regarding the report; rather, such evidence was given due consideration and resulted in a substantive review of the alleged errors. Further, the alleged errors here were not purely factual as in Frisch v. Commissioner, supra, but involved complex engineering assumptions. The response of the revenue agent, and thus the conduct of respondent, was appropriate and reasonable, and there was not a failure to take action as in Frisch v. Commissioner, supra.Second, in this case, the second engineering report specifically addressed the allegations of error in the first *240 report and concluded that the allegations were not well founded. Further investigation by respondent did not reveal that respondent's position was unreasonable. Respondent, therefore, did not maintain a position contrary to such further investigation, as in Gifford Mast v. Commissioner, supra.Respondent's conduct in response to the allegations of error was reasonable and, therefore, substantially justified. On this record, the Court finds that respondent did not blindly rely on the IRS engineer's reports. There was an honest and credible difference of opinion as to the economic and scientific assumptions made in the Cannon promotion materials. The Court does not decide here whether the IRS engineer was correct, but only whether there was no reasonable basis in fact or law to challenge Cannon's projected profitability exclusive of tax benefits. The facts of this case as previously recited convince the Court and fully support the finding that respondent had a reasonable basis upon which to (1) deduct the additional expenses omitted by the offering materials which had a significant effect on cash flow and profitability, (2) challenge the assumed annual price *241 increases of 15 percent, (3) question whether an output of 16 KWH could be achieved, and (4) question whether the windpark had average annual winds of 16 MPH. The evidence and information obtained by respondent was not lacking a reasonable basis in fact. Respondent's position based on such evidence, therefore, was not unreasonable and was substantially justified. Although petitioner and other investors raised questions as to whether the IRS engineer improperly reduced an output figure which was already expressed as net output, the Court concludes that the criticism regarding this alleged error was not enough to render respondent's overall position that profitability was dependent upon tax benefits to be unreasonable. To the extent that petitioner relied on an affidavit from the designer stating that current output data reflected output almost twice that recomputed by respondent, the Court notes that such data would also apparently reflect significantly less output than what was projected by Cannon. Such current output data simply does not prove that respondent's position was unreasonable, but rather is consistent with a finding that Cannon overstated power output and revenues. *242 The Court does not decide whether the IRS engineer's report correctly reduced output by 70 percent, but only whether it was reasonable to take the position that net profit was dependent upon tax benefits, and considering the weight and reasonableness of all the challenges to Cannon's assumptions and computations, the Court finds that respondent's position was not unreasonable, and was, therefore, substantially justified. The Position That The System Was Not Placed In Service
The evidence developed by the revenue agent as of August 21, 1985, regarding the year in which the systems were placed in service included facts relating to when the turbines were shipped to the windpark, whether the construction of the systems had been completed, and when the turbines were "electrified" and "on line." Petitioner relies on section 1.46-3(d)(1), Income Tax Regs., which provides that property is considered to be "placed in service" when "placed in a condition or state of readiness and available for a specifically assigned function." Accordingly, petitioner contends *243 that HGV's system was "placed in service" in 1982 because it was in a state of readiness by virtue of being on line and capable of producing power. Respondent, however, cites Piggly Wiggly Southern, Inc. v. Commissioner, 84 T.C. 739, 746-748 (1984), affd. 803 F.2d 1572 (11th Cir. 1986), for the proposition that, where the property is to be used in a new trade or business, as in this case, the new business must commence for the property to be considered placed in service. Accordingly, petitioner was required to show, not only that HGV's system was on line, but also that HGV's turbine was actually operating and producing power in 1982. The Court is not called upon here to decide the merits of petitioner's case, but only to determine whether respondent's position was unreasonable. On this record, the Court finds that there was clearly a valid factual issue whether HGV's turbine was electrified and on line as of December 31, 1982, and there was a valid legal issue whether HGV was further required to commence business as a prerequisite to having the property *244 considered placed in service as of the date claimed by petitioner. The evidence presented to the revenue agent as of August 21, 1985, did not conclusively establish whether HGV's system was on line or producing power by December 31, 1982. Respondent had obtained a letter from WPS, dated January 5, 1983, which stated that only 30 turbines had been electrified, and that WPS "will require approximately one day per each group of ten units to ready them for service after power has been connected." This letter was written contemporaneously with the start up of the windpark by the party responsible for testing of the turbines and was supported by the statements of two WPS officers. Further, no documentary evidence was presented to or obtained by the revenue agent which contradicted the contents of this letter, and to date petitioner has not presented any such evidence. Contrary to petitioner's allegation, and weighing the probative value of the written evidence, whether truthful or not, it was not unreasonable for the revenue agent to give more weight to this letter than to uncorroborated statements of petitioner's witnesses. Petitioner alleges that respondent's failure to interview *245 witnesses at an earlier date was unreasonable because the statements by such witnesses presented by way of affidavit to the appeals officer established that HGV's system was placed in service in 1982, and these witnesses have always been available to respondent. First, as previously stated, to the extent any such alleged failure relates to periods prior to August 21, 1985, such conduct is not to be examined in determining reasonable conduct. Second, and more noteworthy, however, the Court is not convinced that the statements submitted by affidavits to the appeals officer refuted the contents of the January 5, 1983, WPS letter. The affidavit of the WPS employee did not address whether or not the turbines were electrified or on line, but only whether the system had been physically erected. Another affidavit addressed only whether concrete foundations had been completed. The statement by a Cannon officer acknowledged that he did not even have first hand knowledge as to whether the units were on line. Further, his explanation of the retro-fit program, including the project status report which he received, but did not author, does not state whether the off-line units awaiting retro-fit *246 had ever been on line prior to retro-fit. The fact that the retro-fit program was not a necessary element to energizing the turbines or placing them on line, does not establish whether the systems were energized and on line before December 31, 1982. In fact, the status report, dated January 3, 1983, implies just the opposite wherein it states that "those machines cannot be put on line until the general contractor hired by Cannon supplies these turbines with utility power." Because the statements of these witnesses did not render respondent's position that petitioner's turbine was not on line unreasonable when obtained in 1987, the alleged failure to interview these witnesses had no effect on the reasonableness of respondent's position at any earlier point. The Court agrees with respondent that whether HGV was required to commence business in order for the property to be placed in service was a valid legal issue. See Piggly Wiggly Southern, Inc. v. Commissioner, supra at 747-748. Further, the Court notes, in the event that petitioner was required to make such a showing, the record would not support a finding that HGV's unit was actually operated as of or before *247 December 31, 1982. Petitioner has at no time even alleged, much less established, that HGV's turbine was operated in 1982. The evidence addresses only whether the systems in general were capable of operating, and further, there is a noted absence of any evidence with respect to HGV's system in particular. Several of petitioner's witnesses stated that all of the systems were on line but, even accepting these statements as true, the witnesses further stated that the term "on line" means capable of operating, not actual operation. Consequently, the basic, essential, and fundamental question as to whether the systems, and in particular HGV's system, were "placed in service" stands out in much the same fashion as the proverbial sore thumb. Petitioner argues that it was unreasonable for respondent to take a position contrary to the example at section 1.46-3(d)(2)(iii), Income Tax Regs., and Rev. Rul. 76-256, 1976-2 C.B. 46. These authorities are both distinguishable. Section 1.46-3(d)(2)(iii), Income Tax Regs., describes a situation where the taxpayer was already engaged in the business, unlike HGV in this case. Piggly Wiggly Southern, Inc. v. Commissioner, supra at 748. *248 In Rev. Rul. 76-256, 1976-2 C.B. 46, the facts clearly state that power operation had been achieved during the year. In this case, there is simply no evidence to support a finding that power operation had commenced or had even been attempted as to HGV's unit. Also significant is the fact that respondent recognized that power had been produced by at least some of the units, as evidenced by an invoice from Edison and, therefore, conceded that the 30 units indicated to be electrified and on line in the January 5, 1983, letter had been placed in service, with the exception of one unit which had allegedly been returned for repairs. This was conceded in the RAR and at no time after issuance of the RAR has this position been otherwise. To require petitioner to show that HGV's system was one of the 29 units on line and producing power, if such was the case, was not unreasonable. Accordingly, petitioner has not proven that respondent's position on this issue was not substantially justified. Finally, petitioner argues that the conduct of the appeals office and respondent's refusal to participate in discovery until threatened by petitioner was unreasonable, and that the sole *249 reason for the review of the case by appeals was to cover up a deficient examination in the event a motion for litigation costs would be filed. The Court does not agree, for it appears that the difficulties petitioner's attorney experienced were as much his own making as that of respondent, if respondent is to be blamed at all. First, the Court does not consider the one year delay in consideration of this case by appeals to be significant because petitioner made no attempts to settle during this period, and the delay on the part of the appeals office was due to a reasonable cause, not an intent to hinder or delay negotiation. See Sokol v. Commissioner, supra at 765, and cases cited therein. Second, petitioner has not argued that it was unreasonable for discovery to be controlled through district counsel in this case, and the Court is convinced that respondent's actions were wholly justified and proper. The impatience of petitioner's attorney does not thereby make respondent unreasonable for adhering to an agreed upon schedule. Third, the Court finds that the actions of the appeals officer in conducting settlement negotiations and in researching the issues *250 in this case were proper and untainted by some after the fact attempt to cover the tracks of the revenue agent. No evidence has been presented which suggests that the appeals officer did anything other than handle the case in a professional, considered, and timely manner. Accordingly, the Court finds that respondent's positions that the transaction lacked economic substance and that HGV's system had not been placed in service in 1982 were both substantially justified. Having found that the position of the United States was substantially justified, the Court finds it unnecessary to pass upon the remaining issues. Petitioner's motion for litigation costs is, therefore, denied. An appropriate order will be issued. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. These classifications have been superseded. See Internal Revenue Manual Transmittal 4200-505 (March 3, 1985).↩
3. Section 7430(c)(4) was enacted by section 1551(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2752 on October 22, 1986, applicable to proceedings commenced after December 31, 1985. Section 7430(c)(4), as applicable to the motion now before the Court, was subsequently amended and redesignated as section 7430(c)(7) by the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, 102 Stat. 3342 (1988), applicable to proceedings commenced after November 10, 1988, to provide as follows: (7) Position of the United States.-The term "position of the United States" means- (A) the position taken by the United States in a judicial proceeding to which subsection (a) applies, and (B) the position taken in an administrative proceeding to which subsection (a) applies as of the earlier of- (i) the date of the receipt by the taxpayer of the notice of the decision of the Internal Revenue Service Office of Appeals, or (ii) the date of the notice of deficiency.↩